## ALDERMAN ET AL. v. UNITED STATES.

No. 133, Oct. Term, 1967. Certiorari denied October 9, 1967.—Rehearing and certiorari granted and case decided January 29, 1968.—Motion to modify argued May 2, 1968.—Reargued October 14, 1968.—Order of January 29, 1968, withdrawn, rehearing and certiorari granted, and case decided March 10, 1969.*

---

*Together with No. 11, *Ivanov* v. *United States,* and No. 197, *Butenko* v. *United States,* on certiorari to the United States Court of Appeals for the Third Circuit, argued October 14, 1968.

166

*Solicitor General Griswold* reargued for the United States in No. 133, October Term, 1967, on the motion to modify the Court's Order of January 29, 1968, 390 U. S. 136. With him on the brief were *Assistant Attorney General Vinson, Louis F. Claiborne, John S. Martin, Jr., Beatrice Rosenberg,* and *Sidney M. Glazer.*

*Edward Bennett Williams* reargued for petitioners in No. 133, October Term, 1967, in opposition to the motion. With him on the brief were *Harold Ungar* and *W. H. Erickson.*

*Mr. Williams* argued the cause and filed a brief for petitioner in No. 11. *Charles Danzig,* by appointment of the Court, 393 U. S. 814, argued the cause and filed a brief for petitioner in No. 197.

*Solicitor General Griswold* argued the cause for the United States in Nos. 11 and 197. With him on the brief were *Assistant Attorney General Yeagley, Messrs. Claiborne* and *Martin,* and *Kevin T. Maroney.*

MR. JUSTICE WHITE delivered the opinion of the Court.

After the convictions of petitioners had been affirmed, and while their cases were pending here, it was revealed that the United States had engaged in electronic surveillance which might have violated their Fourth Amendment rights and tainted their convictions. A remand to the District Court being necessary in each case for adjudication in the first instance, the questions now before us relate to the standards and procedures to be followed by the District Court in determining whether any of the Government's evidence supporting these convictions was the product of illegal surveillance to which any of the petitioners are entitled to object.

No. 133, O. T., 1967. Petitioners Alderman and Alderisio, along with Ruby Kolod, now deceased, were convicted of conspiring to transmit murderous threats in interstate commerce, 18 U. S. C. §§ 371, 875 (c). Their convictions were affirmed on appeal, 371 F. 2d 983 (C. A. 10th Cir. 1967), and this Court denied certiorari, 389 U. S. 834 (1967). In their petition for rehearing, petitioners alleged they had recently discovered that Alderisio's place of business in Chicago had been the subject of electronic surveillance by the Government. Reading the response of the Government to admit that Alderisio's conversations had been overheard by unlawful

electronic eavesdropping,[1] we granted the petition for rehearing over the objection of the United States that "no overheard conversation in which any of the petitioners participated is arguably relevant to this prosecution." In our *per curiam* opinion, 390 U. S. 136 (1968), we refused to accept the *ex parte* determination of relevance by the Department of Justice in lieu of adversary proceedings in the District Court, vacated the judgment of the Court of Appeals, and remanded the case to the District Court for further proceedings.

The United States subsequently filed a motion to modify that order. Although accepting the Court's order insofar as it required judicial determination of whether any of the prosecution's evidence was the product of illegal surveillance, the United States urged that in order to protect innocent third parties participating or referred to in irrelevant conversations overheard by the Government, surveillance records should first be subjected to *in camera* inspection by the trial judge, who would then turn over to the petitioners and their counsel only those materials arguably relevant to their prosecution. Petitioners opposed the motion, and the matter was argued before the Court last Term. We then set the case down for reargument at the opening of the current Term, 392 U. S. 919 (1968), the attention of the parties being directed to the disclosure issue and the question of

---

[1] In its brief on reargument, the Government suggests that no electronic surveillance was conducted at places owned by Alderisio, but rather was carried out only at premises owned by his associates or by firms which employed him. The Government also contends that Alderisio himself did not have desk space at the subject premises. Finally, the Government asserts that Alderman neither participated in any conversation overheard nor had any interest in the places which were the object of the surveillance. These allegations by the Government will have to be considered by the District Court in the first instance, and we express no opinion now on their merit.

standing to object to the Government's use of the fruits of illegal surveillance.[2]

Nos. 11 and 197. Both petitioners were convicted of conspiring to transmit to the Soviet Union information relating to the national defense of the United States, 18 U. S. C. §§ 794 (a), (c), and of conspiring to violate 18 U. S. C. § 951 by causing Butenko to act as an agent of the Soviet Union without prior notification to the Secretary of State. Butenko was also convicted of a substantive offense under 18 U. S. C. § 951. The Court of Appeals affirmed all but Ivanov's conviction on the second conspiracy count. 384 F. 2d 554 (C. A. 3d Cir. 1967). Petitions for certiorari were then filed in this Court, as was a subsequent motion to amend the

---

[2] In our order of June 17, 1968, restoring the Government's motion to the calendar for reargument, 392 U. S. 919–920, we requested counsel to include the following among issues to be discussed in briefs and oral argument:

"(1) Should the records of the electronic surveillance of petitioner Alderisio's place of business be subjected to *in camera* inspection by the trial judge to determine the necessity of compelling the Government to make disclosure of such records to petitioners, and if so to what extent?

"(2) If *in camera* inspection is authorized or ordered, by what standards (for example, relevance and considerations of injury to persons or to reputations) should the trial judge determine whether the records are to be turned over to petitioners?

"(3) What standards are to be applied in determining whether each petitioner has standing to object to the use against him of the information obtained from the electronic surveillance of petitioner Alderisio's place of business? More specifically, does petitioner Alderisio have standing to object to the use of any or all information obtained from such electronic surveillance whether or not he was present on the premises or party to a particular overheard conversation? Also, does petitioner Alderman have standing to object to the use against him of any or all information obtained from the electronic surveillance of petitioner Alderisio's business establishment?"

*Ivanov* petition to raise an issue similar to that which was presented in No. 133, O. T. 1967.[3] Following the first argument in *Alderman* (*sub nom. Kolod* v. *United States*), the petitions for certiorari of both Ivanov and Butenko were granted, limited to questions nearly identical to those involved in the reargument of the *Alderman* case.[4]

---

[3] The United States admits overhearing conversations of each petitioner, but where the surveillance took place and other pertinent details are unknown. In its brief the Government states:

"In some of the instances the installation had been specifically approved by the then Attorney General. In others the equipment was installed under a broader grant of authority to the F. B. I., in effect at that time, which did not require specific authorization. . . . [P]resent Department of Justice policy would call for specific authorization from the Attorney General for any use of electronic equipment in such cases."

In all three cases, the District Court must develop the relevant facts and decide if the Government's electronic surveillance was unlawful. Our assumption, for present purposes, is that the surveillance was illegal.

[4] In each case the grant of certiorari, 392 U. S. 923, was limited to the following questions:

"On the assumption that there was electronic surveillance of petitioner or a codefendant which violated the Fourth Amendment,

"(1) Should the records of such electronic surveillance be subjected to *in camera* inspection by the trial judge to determine the necessity of compelling the Government to make disclosure of such records to petitioner, and if so to what extent?

"(2) If *in camera* inspection is to be authorized or ordered, by what standards (for example, relevance, and considerations of national security or injury to persons or reputations) should the trial judge determine whether the records are to be turned over to the defendant?

"(3) What standards are to be applied in determining whether petitioner has standing to object to the use against him of information obtained from such illegal surveillance? More specifically, if illegal surveillance took place at the premises of a particular defendant,

"(a) Does that defendant have standing to object to the use against him of any or all information obtained from the illegal sur-

## I.

The exclusionary rule fashioned in *Weeks* v. *United States,* 232 U. S. 383 (1914), and *Mapp* v. *Ohio,* 367 U. S. 643 (1961), excludes from a criminal trial any evidence seized from the defendant in violation of his Fourth Amendment rights. Fruits of such evidence are excluded as well. *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 391–392 (1920). Because the Amendment now affords protection against the uninvited ear, oral statements, if illegally overheard, and their fruits are also subject to suppression. *Silverman* v. *United States,* 365 U. S. 505 (1961); *Katz* v. *United States,* 389 U. S. 347 (1967).

In *Mapp* and *Weeks,* the defendant against whom the evidence was held to be inadmissible was the victim of the search. However, in the cases before us each petitioner demands retrial if any of the evidence used to convict him was the product of unauthorized surveillance, regardless of whose Fourth Amendment rights the surveillance violated. At the very least, it is urged that if evidence is inadmissible against one defendant or conspirator, because tainted by electronic surveillance illegal as to him, it is also inadmissible against his codefendant or coconspirator.

This expansive reading of the Fourth Amendment and of the exclusionary rule fashioned to enforce it is admittedly inconsistent with prior cases, and we reject it. The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were vio-

---

veillance, whether or not he was present on the premises or party to the overheard conversation?

"(b) Does a codefendant have standing to object to the use against him of any or all information obtained from the illegal surveillance, whether or not he was present on the premises or party to the overheard conversation?"

lated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing.

Thus in *Goldstein* v. *United States,* 316 U. S. 114 (1942), testimony induced by disclosing to witnesses their own telephonic communications intercepted by the Government contrary to 47 U. S. C. § 605 was held admissible against their coconspirators. The Court equated the rule under § 605 with the exclusionary rule under the Fourth Amendment.[5] *Wong Sun* v. *United States,* 371 U. S. 471 (1963), came to like conclusions. There, two defendants were tried together; narcotics seized from a third party were held inadmissible against one defendant because they were the product of statements made by him at the time of his unlawful arrest. But the same narcotics were found to be admissible against the codefendant because "[t]he seizure of this

---

[5] As the issue was put and answered by the Court:

"The question now to be decided is whether we shall extend the sanction for violation of the Communications Act so as to make available to one not a party to the intercepted communication the objection that its use outside the courtroom, and prior to the trial, induced evidence which, except for that use, would be admissible.

"No court has ever gone so far in applying the implied sanction for violation of the Fourth Amendment. While this court has never been called upon to decide the point, the federal courts in numerous cases, and with unanimity, have denied standing to one not the victim of an unconstitutional search and seizure to object to the introduction in evidence of that which was seized. *A fortiori* the same rule should apply to the introduction of evidence induced by the use ·or disclosure thereof to a witness other than the victim of the seizure. We think no broader sanction should be imposed upon the Government in respect of violations of the Communications Act." 316 U. S., at 121.

The Court noted that the principle had been applied "in at least fifty cases by the Circuit Courts of Appeals . . . not to mention many decisions by District Courts." *Id.,* at 121, n. 12.

heroin invaded no right of privacy of person or premises which would entitle [him] to object to its use at his trial. Cf. *Goldstein* v. *United States,* 316 U. S. 114." *Wong Sun* v. *United States, supra,* at 492.

The rule is stated in *Jones* v. *United States,* 362 U. S. 257, 261 (1960):

> "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. . . .
>
> "Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy." [6]

This same principle was twice acknowledged last Term. *Mancusi* v. *DeForte,* 392 U. S. 364 (1968); *Simmons* v. *United States,* 390 U. S. 377 (1968).[7]

---

[6] The "person aggrieved" language is from Fed. Rule Crim. Proc. 41 (e). *Jones* thus makes clear that Rule 41 conforms to the general standard and is no broader than the constitutional rule.

[7] *McDonald* v. *United States,* 335 U. S. 451 (1948), is not authority to the contrary. It is not at all clear that the *McDonald* opinion would automatically extend standing to a codefendant. Two of the five Justices joining the majority opinion did not read the opinion to do so and found the basis for the codefendant's standing to be the fact that he was a guest on the premises searched. "But even a guest may expect the shelter of the rooftree he is under against criminal intrusion." *Id.,* at 461 (Jackson, J., concurring). Cf. *Jones* v. *United States,* 362 U. S. 257 (1960). Nor does *Hoffa* v. *United States,* 385 U. S. 293 (1966), lend any support to petitioners' position, since the Court expressly put aside the issue of standing.

We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. *Simmons* v. *United States,* 390 U. S. 377 (1968); *Jones* v. *United States,* 362 U. S. 257 (1960). Cf. *Tileston* v. *Ullman,* 318 U. S. 44, 46 (1943). None of the special circumstances which prompted *NAACP* v. *Alabama,* 357 U. S. 449 (1958), and *Barrows* v. *Jackson,* 346 U. S. 249 (1953), are present here. There is no necessity to exclude evidence against one defendant in order to protect the rights of another. No rights of the victim of an illegal search are at stake when the evidence is offered against some other party. The victim can and very probably will object for himself when and if it becomes important for him to do so.

What petitioners appear to assert is an independent constitutional right of their own to exclude relevant and probative evidence because it was seized from another in violation of the Fourth Amendment. But we think there is a substantial difference for constitutional purposes between preventing the incrimination of a defendant through the very evidence illegally seized from him and suppressing evidence on the motion of a party who cannot claim this predicate for exclusion.

The necessity for that predicate was not eliminated by recognizing and acknowledging the deterrent aim of the rule. See *Linkletter* v. *Walker,* 381 U. S. 618 (1965); *Elkins* v. *United States,* 364 U. S. 206 (1960). Neither those cases nor any others hold that anything which deters illegal searches is thereby commanded by the Fourth Amendment. The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that

the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.

We do not deprecate Fourth Amendment rights. The security of persons and property remains a fundamental value which law enforcement officers must respect. Nor should those who flout the rules escape unscathed. In this respect we are mindful that there is now a comprehensive statute making unauthorized electronic surveillance a serious crime.[8] The general rule under the statute is that official eavesdropping and wiretapping are permitted only with probable cause and a warrant. Without experience showing the contrary, we should not assume that this new statute will be cavalierly disregarded or will not be enforced against transgressors.

Of course, Congress or state legislatures may extend the exclusionary rule and provide that illegally seized evidence is inadmissible against anyone for any purpose.[9] But for constitutional purposes, we are not now

---

[8] Title III, Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90–351, 82 Stat. 211. Not only does the Act impose criminal penalties upon those who violate its provisions governing eavesdropping and wiretapping, 82 Stat. 213 (18 U. S. C. § 2511 (1964 ed., Supp. IV)) (fine of not more than $10,000, or imprisonment for not more than five years, or both), but it also authorizes the recovery of civil damages by a person whose wire or oral communication is intercepted, disclosed, or used in violation of the Act, 82 Stat. 223 (18 U. S. C. § 2520 (1964 ed., Supp. IV)) (permitting recovery of actual and punitive damages, as well as a reasonable attorney's fee and other costs of litigation reasonably incurred).

[9] Congress has not done so. In its recent wiretapping and eavesdropping legislation, Congress has provided only that an "aggrieved person" may move to suppress the contents of a wire or oral communication intercepted in violation of the Act. Title III, Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 221 (18 U. S. C. § 2518 (10) (a) (1964 ed., Supp. IV)). The Act's legislative history

inclined to expand the existing rule that unlawful wiretapping or eavesdropping, whether deliberate or negligent, can produce nothing usable against the person aggrieved by the invasion.

## II.

In these cases, therefore, any petitioner would be entitled to the suppression of government evidence originating in electronic surveillance violative of his own Fourth Amendment right to be free of unreasonable searches and seizures. Such violation would occur if the United States unlawfully overheard conversations of a petitioner himself or conversations occurring on his premises, whether or not he was present or participated in those conversations. The United States concedes this much and agrees that for purposes of a hearing to determine whether the Government's evidence is tainted by illegal surveillance, the transcripts or recordings of the overheard conversations of any petitioner or of third persons on his premises must be duly and properly examined in the District Court.

MR. JUSTICE HARLAN and MR. JUSTICE STEWART, who are in partial dissent on this phase of the case, object to our protecting the homeowner against the use of third-party conversations overheard on his premises by an unauthorized surveillance. Their position is that unless the conversational privacy of the homeowner himself is invaded, there is no basis in the Fourth Amendment for excluding third-party conversations overheard on his premises. We cannot agree. If the police make an unwarranted search of a house and seize tangible property belonging to third parties—even a transcript of a third-party conversation—the homeowner may object to

---

indicates that "aggrieved person," the limiting phrase currently found in Fed. Rule Crim. Proc. 41 (e), should be construed in accordance with existent standing rules. See S. Rep. No. 1097, 90th Cong., 2d Sess., at 91, 106.

its use against him, not because he had any interest in the seized items as "effects" protected by the Fourth Amendment, but because they were the fruits of an unauthorized search of his house, which is itself expressly protected by the Fourth Amendment.[10]   Nothing seen or found on the premises may legally form the basis for an arrest or search warrant or for testimony at the homeowner's trial, since the prosecution would be using the fruits of a Fourth Amendment violation.  *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920); *Johnson* v. *United States,* 333 U. S. 10 (1948); *Wong Sun* v. *United States,* 371 U. S. 471 (1963).

The Court has characteristically applied the same rule where an unauthorized electronic surveillance is carried out by physical invasion of the premises.  This much the dissent frankly concedes.  Like physical evidence which might be seized, overheard conversations are fruits

---

[10] If the police enter a house pursuant to a valid warrant authorizing the seizure of specified gambling paraphernalia but discover illegal narcotics in the process of the search, the narcotics may be seized and introduced in evidence in the prosecution of the homeowner, whether the narcotics belong to him or to a third party. *E. g., Harris* v. *United States,* 331 U. S. 145, 155 (1947).  But if the officers have neither a warrant nor the consent of the householder, it is elementary Fourth Amendment law that the narcotics are suppressible on his motion.  In both cases, however, the homeowner's interest in the narcotics and his standing to object to their seizure are the same; and insofar as the Fourth Amendment's protection of "effects" is concerned, the right of the officer to seize the contraband without a warrant and use it in evidence is identical.  The reason that the narcotics may be seized and introduced in evidence in the first case where there was a valid warrant, in spite of the householder's interest in the narcotics and his standing to object, but not in the second case where there was no warrant is not the simple reason suggested by MR. JUSTICE HARLAN that the householder has a property interest in the narcotics and therefore has "standing" to object.  Rather, it is because in the first case there was no illegal invasion of the premises, while in the second the officer's entry and search violated the Fourth Amendment, the narcotics being the fruit of that illegality.

of an illegal entry and are inadmissible in evidence. *Silverman* v. *United States,* 365 U. S. 505 (1961); *Wong Sun* v. *United States, supra.* When *Silverman* was decided, no right of conversational privacy had been recognized as such; the right vindicated in that case was the Fourth Amendment right to be secure in one's own home. In *Wong Sun,* the words spoken by Blackie Toy when the police illegally entered his house were not usable against him because they were the fruits of a physical invasion of his premises which violated the Fourth Amendment.

Because the Court has now decided that the Fourth Amendment protects a person's private conversations as well as his private premises, *Katz* v. *United States,* 389 U. S. 347 (1967), the dissent would discard the concept that private conversations overheard through an illegal entry into a private place must be excluded as the fruits of a Fourth Amendment violation. Although officers without a valid warrant may not search a house for physical evidence or incriminating information, whether the owner is present or away, the dissent would permit them to enter that house without consent and without a warrant, install a listening device, and use any overheard third-party conversations against the owner in a criminal case, in spite of the obvious violation of his Fourth Amendment right to be secure in his own dwelling. Even if the owner is present on his premises during the surveillance, he would have no complaint unless his own conversations were offered or used against him. Information from a telephone tap or from the microphone in the kitchen or in the rooms of guests or children would be freely usable as long as the homeowner's own conversations are not monitored and used against him. Indeed, if the police, instead of installing a device, secreted themselves on the premises, they could neither testify about nor use against the owner anything they

saw or carried away, but would be free to use against him everything they overheard except his own conversations. And should police overhear third parties describing narcotics which they have discovered in the owner's desk drawer, the police could not then open the drawer and seize the narcotics, but they could secure a warrant on the basis of what they had heard and forthwith seize the narcotics pursuant to that warrant.[11]

These views we do not accept. We adhere to the established view in this Court that the right to be secure in one's house against unauthorized intrusion is not limited to protection against a policeman viewing or seizing tangible property—"papers" and "effects." Otherwise, the express security for the home provided by the Fourth Amendment would approach redundancy. The rights of the owner of the premises are as clearly

---

[11] MR. JUSTICE HARLAN would also distinguish between the situation where a document belonging to a third party and containing his own words is seized from the premises of another without a warrant and the situation where the third party's words are spoken and overheard by electronic surveillance. Under that view the words of the third party would be admissible in the latter instance but not in the former. We would exclude the evidence in both cases.

So also we do not distinguish between electronic surveillance which is carried out by means of a physical entry and surveillance which penetrates a private area without a technical trespass. This much, we think, *Katz* makes quite clear. In either case, officialdom invades an area in which the homeowner has the right to expect privacy for himself, his family, and his invitees, and the right to object to the use against him of the fruits of that invasion, not because the rights of others have been violated, but because his own were. Those who converse and are overheard when the owner is not present also have a valid objection unless the owner of the premises has consented to the surveillance. Cf. *Mancusi* v. *DeForte*, 392 U. S. 364, 367–370 (1968). The Fourth Amendment protects reasonable expectations of privacy and does not protect persons engaged in crime from the risk that those with whom they associate or converse will cooperate with the Government. *Hoffa* v. *United States*, 385 U. S. 293, 303 (1966).

invaded when the police enter and install a listening device in his house as they are when the entry is made to undertake a warrantless search for tangible property; and the prosecution as surely employs the fruits of an illegal search of the home when it offers overheard third-party conversations as it does when it introduces tangible evidence belonging not to the homeowner, but to others. Nor do we believe that *Katz,* by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home or to overrule the existing doctrine, recognized at least since *Silverman,* that conversations as well as property are excludable from the criminal trial when they are found to be the fruits of an illegal invasion of the home. It was noted in *Silverman,* 365 U. S., at 511–512, that

> "This Court has never held that a federal officer may without warrant and without consent physically entrench into a man's office or home, there secretly observe or listen, and relate at the man's subsequent criminal trial what was seen or heard."

The Court proceeded to hold quite the contrary. We take the same course here.

### III.

The remaining aspect of these cases relates to the procedures to be followed by the District Court in resolving the ultimate issue which will be before it—whether the evidence against any petitioner grew out of his illegally overheard conversations or conversations occurring on his premises.[12] The question as stated in *Wong Sun* v. *United States,* 371 U. S. 471, 488 (1963), is " 'whether,

---

[12] It seems that in none of these cases were there introduced any recordings, transcripts, or other evidence of the actual conversations overheard by electronic surveillance.

granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " See also *Nardone* v. *United States,* 308 U. S. 338, 341 (1939).

The Government concedes that it must disclose to petitioners any surveillance records which are relevant to the decision of this ultimate issue. And it recognizes that this disclosure must be made even though attended by potential danger to the reputation or safety of third parties or to the national security—unless the United States would prefer dismissal of the case to disclosure of the information. However, the Government contends that it need not be put to this disclose-or-dismiss option in the instant cases because none of the information obtained from its surveillance is "arguably relevant" to petitioners' convictions, in the sense that none of the overheard conversations arguably underlay any of the evidence offered in these cases. Although not now insisting that its own evaluation of relevance should be accepted automatically and without judicial scrutiny, the United States urges that the records of the specified conversations be first submitted to the trial judge for an *in camera* examination. Any record found arguably relevant by the judge would be turned over to the petitioner whose Fourth Amendment rights have been violated, and that petitioner would then have the opportunity to use the disclosed information in his attempt to show that the Government has used tainted evidence to convict him. Material not arguably relevant would not be disclosed to any petitioner.[13]

---

[13] This would be true even though the material on its face contained no threat of injury to the public interest or national security, apparently because, in the Government's view, it would be very difficult to distinguish between that which threatened and that which

Although this may appear a modest proposal, especially since the standard for disclosure would be "arguable" relevance, we conclude that surveillance records as to which any petitioner has standing to object should be turned over to him without being screened *in camera* by the trial judge. Admittedly, there may be much learned from an electronic surveillance which ultimately contributes nothing to probative evidence. But winnowing this material from those items which might have made a substantial contribution to the case against a petitioner is a task which should not be entrusted wholly to the court in the first instance. It might be otherwise if the trial judge had only to place the transcript or other record of the surveillance alongside the record evidence and compare the two for textual or substantive similarities. Even that assignment would be difficult enough for the trial judge to perform unaided. But a good deal more is involved. An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances. Unavoidably, this is a matter of judgment, but in our view the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court to identify those records which might have contributed to the Government's case.[14]

---

did not. As explained below, we think similar difficulties inhere in distinguishing between records which are relevant to showing taint and those which are not.

[14] In both the volume of the material to be examined and the complexity and difficulty of the judgments involved, cases involving

The United States concedes that when an illegal search has come to light, it has the ultimate burden of persuasion to show that its evidence is untainted. But at the same time petitioners acknowledge that they must go forward with specific evidence demonstrating taint. "[T]he trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin." *Nardone* v. *United States,* 308 U. S. 338, 341 (1939). With this task ahead of them, and if the hearings are to be more than a formality and petitioners not left entirely to reliance on government testimony, there should be turned over to them the records of those overheard conversations which the Government was not entitled to use in building its case against them.

Adversary proceedings are a major aspect of our system of criminal justice. Their superiority as a means for attaining justice in a given case is nowhere more evident than in those cases, such as the ones at bar, where an issue must be decided on the basis of a large volume of

---

electronic surveillance will probably differ markedly from those situations in the criminal law where *in camera* procedures have been found acceptable to some extent. *Dennis* v. *United States,* 384 U. S. 855 (1966) (disclosure of grand jury minutes subject to *in camera* deletion of "extraneous material"); *Palermo* v. *United States,* 360 U. S. 343, 354 (1959) (whether the Jencks Act, 18 U. S. C. § 3500, requires disclosure of document to the defense); *Roviaro* v. *United States,* 353 U. S. 53 (1957) (disclosure of informant's identity). In the *Dennis* case the Court noted that ordinarily "[t]rial judges ought not be burdened with the task or the responsibility of examining sometimes voluminous grand jury testimony," and that it is not "realistic to assume that the trial court's judgment as to the utility of material for impeachment or other legitimate purposes, however conscientiously made, would exhaust the possibilities." 384 U. S., at 874–875.

184

factual materials, and after consideration of the many and subtle interrelationships which may exist among the facts reflected by these records. As the need for adversary inquiry is increased by the complexity of the issues presented for adjudication, and by the consequent inadequacy of *ex parte* procedures as a means for their accurate resolution, the displacement of well-informed advocacy necessarily becomes less justifiable.

Adversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny which the Fourth Amendment exclusionary rule demands. It may be that the prospect of disclosure will compel the Government to dismiss some prosecutions in deference to national security or third-party interests. But this is a choice the Government concededly faces with respect to material which it has obtained illegally and which it admits, or which a judge would find, is arguably relevant to the evidence offered against the defendant.[15]

We think this resolution will avoid an exorbitant expenditure of judicial time and energy and will not unduly prejudice others or the public interest. It must be remembered that disclosure will be limited to the transcripts of a defendant's own conversations and of those which took place on his premises. It can be safely

---

[15] The dissents, it should be noted, would require turnover of arguably relevant material, whatever its impact on national security might be. To this extent there is agreement that the defendant's interest in excluding the fruits of illegally obtained evidence entitles him to the product of the surveillance. Given this basic proposition, the matter comes down to a judgment as to whether *in camera* inspection would characteristically be sufficiently reliable when national security interests are at stake. On this issue, the majority and the dissenters part company.

assumed that much of this he will already know, and disclosure should therefore involve a minimum hazard to others. In addition, the trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect. See Fed. Rule Crim. Proc. 16 (e). We would not expect the district courts to permit the parties or counsel to take these orders lightly.

None of this means that any defendant will have an unlimited license to rummage in the files of the Department of Justice. Armed with the specified records of overheard conversations and with the right to cross-examine the appropriate officials in regard to the connection between those records and the case made against him, a defendant may need or be entitled to nothing else. Whether this is the case or not must be left to the informed discretion, good sense, and fairness of the trial judge. See *Nardone* v. *United States,* 308 U. S. 338, 341–342 (1939).[16]

## IV.

Accordingly, in No. 133, O. T. 1967, the motion of the United States is denied to the extent that it requests an initial *in camera* inspection of the fruits of any unlawful

---

[16] THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE WHITE join the entire opinion of the Court. In addition, MR. JUSTICE HARLAN and MR. JUSTICE STEWART join the opinion to the extent that it denies standing to codefendants, coconspirators, and others whose Fourth Amendment rights have not been violated by the electronic surveillance involved. The four members of the Court joining the entire opinion agree with the opinion in recognizing the householder's standing to object to evidence obtained from an unauthorized electronic surveillance of his premises even where his own conversations are not overheard; MR. JUSTICE FORTAS concurs in the judgment to this extent. Finally, MR. JUSTICE STEWART, in addition to the four members of the Court joining the entire opinion, agrees with Part III of the opinion.

surveillance and the withholding of those portions of the materials which the trial judge might deem irrelevant to these convictions. Primarily because of our decision with respect to standing, however, the order and judgment of January 29, 1968, are withdrawn. The order denying to petitioners a writ of certiorari is set aside. The petition for rehearing is granted, and the petition for certiorari is granted as to both Alderisio and Alderman. The judgments of the Court of Appeals for the Tenth Circuit in No. 133, O. T. 1967, and the judgments of the Court of Appeals for the Third Circuit in Nos. 11 and 197 are vacated, and each of the cases is remanded to the District Court for further proceedings consistent with this opinion, that is, for a hearing, findings, and conclusions (1) on the question of whether with respect to any petitioner there was electronic surveillance which violated his Fourth Amendment rights, and (2) if there was such surveillance with respect to any petitioner, on the nature and relevance to his conviction of any conversations which may have been overheard through that surveillance. The District Court should confine the evidence presented by both sides to that which is material to the question of the possible violation of a petitioner's Fourth Amendment rights, to the content of conversations illegally overheard by surveillance which violated those rights and to the relevance of such conversations to the petitioner's subsequent conviction. The District Court will make such findings of fact on those questions as may be appropriate in light of the further evidence and of the entire existing record. If the District Court decides on the basis of such findings (1) that there was electronic surveillance with respect to one or more petitioners but not any which violated the Fourth Amendment, or (2) that although there was a surveillance in violation of one or more of the petitioners' Fourth Amendment rights, the conviction of such petitioner was not tainted

by the use of evidence so obtained, it will enter new final judgments of conviction based on the existing record as supplemented by its further findings, thereby preserving to all affected parties the right to seek further appropriate appellate review. If, on the other hand, the District Court concludes in such further proceedings that there was a violation of any petitioner's Fourth Amendment rights and that the conviction of the petitioner was tainted by such violation, it would then become its duty to accord such petitioner a new trial.

*Vacated and remanded.*

MR. JUSTICE DOUGLAS, while joining the opinion of the Court, concurs in Part II of the opinion of MR. JUSTICE FORTAS and would hold that the protection of the Fourth Amendment includes also those against whom the investigation is directed.

MR. JUSTICE STEWART. I join MR. JUSTICE HARLAN's separate opinion, except insofar as it would authorize *in camera* proceedings in the *Ivanov* and *Butenko* cases. I would apply the same standards to all three cases now before us, agreeing to that extent with the opinion of the Court.

MR. JUSTICE BLACK dissents, adhering to his dissent in *Katz* v. *United States,* 389 U. S. 347, 364–374 (1967).

MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

The Court's careful opinion is, I think, constructed on a faulty premise, which substantially undermines the validity of its ultimate conclusions. The majority con-

fronts these cases as if each of the two major problems they raise can be solved in only one of two ways. The Court seems to assume that *either* the traditional standing doctrine is to be expanded *or* that the traditional doctrine is to be maintained. Again, it is assumed that *either* an *in camera* decision is to be made by the judge in every case *or* that there is to be an automatic turnover of all conversations in every case. I do not believe, however, that the range of choice open to us on either issue is restricted to the two alternatives the Court considers. On both issues, there is a third solution which would, in my view, more satisfactorily accommodate the competing interests at stake.

## I.

### STANDING.

I am in substantial agreement with the reasons the Court has given for refusing to expand the traditional standing doctrine to permit a Fourth Amendment challenge to be raised by either a codefendant or a co-conspirator.[1] But it does not follow from this that we

---

[1] I also am unable to accept my Brother FORTAS' suggestion that standing be accorded to any defendant who can show that an illegal search or seizure was directed against him. As my Brother FORTAS himself recognizes in stopping short of an extreme position that rejects all standing limitations, a proper decision on this issue cannot only consider the fact that a broadened standing rule may add marginally to the impact of the exclusionary rule on unconstitutional police conduct. Rather, one must also consider that my Brother FORTAS' rule permits a defendant to invade the privacy of others to hear conversations in which he did not participate. Moreover, the rule would entail very substantial administrative difficulties. In the majority of cases, I would imagine that the police plant a bug with the expectation that it may well produce leads to a large number of crimes. A lengthy hearing would, then, appear to be necessary in order to determine whether the police knew of an accused's criminal activity at the time the bug was planted and whether the police decision to plant a bug was moti-

may apply the traditional standing rules without further analysis. The traditional rules, as the majority correctly understands them, would grant standing with regard to (1) conversations in which the accused himself participated and (2) *all* conversations occurring on the accused's "premises," regardless of whether he participated in the particular conversation in any way. As I hope to show, the traditional rationale for this second rule—granting standing to the property owner—does not fit a case involving the infringement of conversational privacy. Moreover, no other persuasive rationale can be developed in support of the property owner's right to make a Fourth Amendment claim as to conversations in which he did not himself participate. Consequently, I would hold that, in the circumstances before us, standing should be granted only to those who actually participated in the conversation that has been illegally overheard.

### A.

There is a very simple reason why the traditional law of standing permits the owner of the premises to exclude a tangible object illegally seized on his property, despite the fact that he does not own the particular object taken by the police. Even though he does not have title to the object, the owner of the premises is in possession of it—and we have held that a property interest of even less substance is a sufficient predicate for standing under the Fourth Amendment. *Jones* v. *United States,* 362 U. S. 257 (1960).[2] This simple rationale does not, how-

---

vated by an effort to obtain information against the accused or some other individual. I do not believe that this administrative burden is justified in any substantial degree by the hypothesized marginal increase in Fourth Amendment protection.

[2] The Court suggests, *ante,* at 177, n. 10, that I am wrong in finding that the traditional grant of standing to the property owner may properly be grounded on the simple fact of the owner's domin-

ever, justify granting standing to the property owner with regard to third-party conversations. The absent property owner does not have a property interest of any sort in a conversation in which he did not participate. The words that were spoken are gone beyond recall.[3]

Consequently, in order to justify the traditional rule, one must argue, as does the majority, that the owner of the premises should be granted standing because the bugged third-party conversations are "fruits" of the police's infringement of the owner's property rights. The "fruits" theory, however, does not necessarily fit when the police overhear private conversations in violation of the Fourth Amendment. As *Katz* v. *United States*, 389 U. S. 347, 352–353 (1967), squarely holds, the right to the privacy of one's conversation does not

---

ion over all physical objects on his premises. The majority argues that even though a particular object (say a packet of narcotics) is not described in a valid search warrant, it may nevertheless be seized if the police find the narcotics in their search for the other evidence of crime. It follows from this, says the Court, that the householder's possessory interest in the seized property is not a sufficient basis for standing. But this argument ignores the fact that an accused may have *standing* to raise a Fourth Amendment claim and yet lose on the *merits*. In the case the Court hypothesizes, the householder has standing because he has lost possession of an object formerly under his control. However, he loses on the merits because the police seizure was reasonable under the circumstances.

[3] Thus, unlike the Court, I find it quite easy to distinguish "between the situation where a document belonging to a third party and containing his own words is seized from the premises of another without a warrant and the situation where the third party's words are spoken and overheard by electronic surveillance." *Ante*, at 179, n. 11. While the absent owner can read the document when he returns to his home, he cannot summon back the words that were spoken in his absence. In the one case, the owner is personally aggrieved by the police action; in the other case, he is not.

hinge on whether the Government has committed a technical trespass upon the premises on which the conversations took place. *Olmstead* v. *United States,* 277 U. S. 438 (1928), is no longer the law. If in fact there has been no trespass upon the premises, I do not understand how traditional theory permits the owner to complain if a conversation is overheard in which he did not participate. Certainly the owner cannot suppress records of such conversations on the ground that they are the "fruits" of an unconstitutional invasion of his property rights. See *Goldman* v. *United States,* 316 U. S. 129, 135–136 (1942).

It is true, of course, that the "fruits" theory would require a different result if the police used a listening device which did physically trespass upon the accused's premises. But the fact that this theory depends completely on the presence or absence of a technical trespass only serves to show that the entire theoretical basis of standing law must be reconsidered in the area of conversational privacy. For we have not buried *Olmstead,* so far as it dealt with the substance of Fourth Amendment rights, only to give it new life in the law of standing. Instead, we should reject traditional property concepts entirely, and reinterpret standing law in the light of the substantive principles developed in *Katz.* Standing should be granted to every person who participates in a conversation he legitimately expects will remain private—for it is such persons that *Katz* protects.[4] On the other hand, property owners should not be permitted to assert a Fourth Amendment claim in this area if we are to respect the principle, whose vitality the Court has now

---

[4] It seems clear that, under the *Katz* rationale, a person is personally aggrieved by electronic surveillance not only when he is actually speaking but also when he is listening to the confidences of others.

once again reaffirmed, which establishes "the general rule that Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Ante,* at 174. For granting property owners standing does not permit them to vindicate intrusions upon their *own* privacy, but simply permits criminal defendants to intrude into the private lives of others.

The following hypothetical suggests the paradoxical quality of the Court's rule. Imagine that I own an office building and permit a friend of mine, Smith, to use one of the vacant offices without charge. Smith uses the office to have a private talk with a third person, Jones. The next day, I ask my friend to tell me what Jones had said in the office I had given him. Smith replies that the conversation was private, and that what was said was "none of your business." Can it be that I could properly feel aggrieved because the conversation occurred on my property? It would make no sense if I were to reply to Smith: "*My privacy* has been infringed if you do not tell me what was said, for I own the *property!*" It is precisely the other way around—Smith is telling me that when he and Jones had talked together, they had a legitimate expectation that their conversation would remain secret, even from me as the property owner.

Now suppose that I had placed a listening device in the office I had given to Smith, without telling him. Could anyone doubt that I would be guilty of an outrageous violation of the privacy of Smith and Jones if I then listened to what they had said? It would be ludicrous to defend my conduct on the ground that I, after all, was the owner of the office building. The case does not stand differently if I am accused of a crime and demand the right to hear the Smith-Jones conversation which the police had monitored. The Government doubtless has violated the privacy of Smith and Jones,

but their privacy would be violated *further* if the conversation were also made available to me.[5]

In the field of conversational privacy, the Fourth Amendment protects persons, not places. See *Katz* v. *United States,* 389 U. S. 347, 351 (1967). And a man can only be in one place at one time. If the privacy of his conversation is respected at that place, he may engage in all those activities for which that privacy is an essential prerequisite. His *privacy* is not at all disturbed by the fact that other people in other places cannot speak without the fear of being overheard. That fact may be profoundly disturbing to the man whose privacy remains intact. But it remains a fact about *other* people's privacy. To permit a criminal defendant to complain about such intrusions is to permit the vicarious assertion of Fourth Amendment rights—a step which I decline to take in relation to property owners for much the same reasons as those which have impelled the Court to deny standing to coconspirators.

In rejecting the "property" rule advanced by the Court, I do not mean to suggest that standing may never properly be granted to permit the vicarious assertion of Fourth Amendment rights. While it is arguable that an individual should be permitted to raise a constitutional claim when the privacy of members of his family has been violated, I need not reach this question on the facts of the cases before us. It must be noted, however, that even if this Court recognized a man's right to protest whenever the privacy of his family was infringed, the lines the majority draws today would still seem extremely arbitrary. Under the prevailing "property" rule, for example, a husband generally cannot complain

---

[5] This is not to say, of course, that the property owner could not bring a civil action to have the illegal listening device removed from his premises. He simply could not hear what the listening device had recorded, if none of his own conversations had been overheard.

if the police overhear his wife talking at her office or in a public phone booth, cf. *Katz* v. *United States, supra,* although he can complain when the police overhear her talking at home. Yet surely the husband's interest in his wife's privacy is equally worthy of respect in all three cases. If standing is to be extended to protect a person's interest in his family's privacy, an individual should be permitted to make a constitutional claim *whenever* a family member's reasonable expectation of privacy has been infringed, regardless of the place where his privacy was invaded. Indeed, the Court's emphasis on property ownership could well mean that a husband, as owner of a particular property, is entitled to complain as to a violation of his wife's privacy, but that the wife could not complain as to the unlawful surveillance of her husband since she did not have a sufficiently substantial interest in the property on which the intrusion occurred. In contrast, if a perfect stranger is overheard on one's property, standing is established. In sum, I simply cannot discern a coherent policy behind the Court's solicitude for property interests in this area.

### B.

The Court's lengthy discussion of my position loses sight of the basic justification for the narrower standing rule I have advanced. To recapitulate, it is my central aim to show that the right to conversational privacy is a personal right, not a property right. It follows from this that the Court's rule permits property owners to assert vicariously the personal rights of others. Indeed, granting standing to property owners compromises the personal privacy of others.

The Court's response seems to be that the Fourth Amendment protects "houses" as well as "persons." But this is simply to treat private conversations as if they were pieces of tangible *property.* Since an individual

cannot carry his possessions with him wherever he goes, the Fourth Amendment protects a person's "house" so that his personal possessions may be kept out of the Government's easy reach. In contrast, a man must necessarily carry his voice around with him, and cannot leave it at home even if he wishes. When a man is not at home, he cannot converse there. There is thus no need to protect a man's "house" in order to protect *his* right to engage in private conversation. Consequently, the Court has not increased the scope of an accused's *personal* privacy by holding that the police have unconstitutionally invaded his "house" by putting a "bug" there. Houses do not speak; only people do. The police have violated only the *privacy* of those persons whose conversations are overheard.

I entirely agree, however, that if the police see a person's tangible property while committing their trespass, they may not constitutionally use this knowledge either to obtain a search warrant or to gain a conviction. Since a man has no choice but to leave the bulk of his physical possessions in his "house," the Fourth Amendment must protect his "house" in this way or else the immunity of his personal possessions from arbitrary search could not be assured. Thus if an individual's personal *possessions* are to be protected at all, they must be protected in his house; but a person's private *conversations* are protected as much as is possible when he can complain as to any conversation in which he personally participated. To go further and protect other conversations occurring on his property is simply to give the householder the right to complain as to the Government's treatment of others.

## C.

While the Court grants special standing rights to property owners, it refuses to reach the question whether employees, business visitors, social guests, and other

persons with less substantial property interests are also entitled to special standing privileges. Yet this question will be presented to the District Court on remand in the *Alderisio* case,[6] and it will doubtless be an issue in many of the other cases now on our docket which we will remand for reconsideration in the light of our decision today. While a definitive solution to this problem is obviously premature, the Court's failure to give the lower courts any guidance whatever on this point will result in widespread confusion as trial judges throughout the land attempt to divine the rationale behind the property rule established today. Confusion will be compounded by our own past decisions which have decisively rejected the notion that the accused must necessarily have a possessory interest in the premises before he may assert a Fourth Amendment claim. See *United States* v. *Jeffers,* 342 U. S. 48 (1951); *Jones* v. *United States,* 362 U. S. 257 (1960); *Mancusi* v. *DeForte,* 392 U. S. 364 (1968). But it will not do simply to incorporate the standing law developed in those cases in an effort to solve the problem before us. For our past decisions involved situations in which the police search was directed against the individual seeking to invoke the Fourth Amendment. Here, however, the question is whether an individual may hear the conversations of third parties.[7] If, for example, it develops at the hearing that petitioner Alderisio simply had a bare right to

---

[6] As the Court points out, *ante,* at 168, n. 1, the Government denies that electronic surveillance took place on property owned by Alderisio. Rather, the premises were owned either by firms which employed Alderisio or by "business associates."

[7] I have not thought it necessary to deal with the subsidiary question of the standing of any of these petitioners to challenge at trial any evidence submitted against them that is alleged to be a fruit of a bugged conversation in which they participated. I agree that this is a question that should be left to the District Court for determination in the first instance at the hearing on remand.

remain on the business premises that were bugged, cf. *Jones* v. *United States, supra,* it surely could not be argued that his privacy had been infringed even though he had not been personally involved in any of the conversations that had been overheard. The Court seems duty bound to make at least this much clear.[8]

## II.

### IN CAMERA PROCEEDINGS.

While I would hold that property owners have no right as such to hear conversations in which they were not participants, it appears to me that at a minimum the Court should adopt the Government's suggested judicial screening procedure with regard to third-party conversations. Property owners should not be permitted to intrude into the private lives of others unless a trial judge determines that the conversation at issue is at least arguably relevant to the pending prosecution.

On the other hand, I would agree that in the typical case, the prosecution should be required to hand over the records of all conversations in which the accused played a part. Since the other parties to these conversations knew they were talking to the accused, they can hardly have an important interest in concealing from him what they said to him. Whatever risk of unauthorized disclosure is involved may generally be minimized even further by the issuance of appropriate protective orders. Fed. Rule Crim. Proc. 16 (e).

There is, however, at least one class of cases in which the standard considerations do not apply. I refer to the situations exemplified by *Ivanov* and *Butenko,* in which the defendant is charged, under one statute or another,

---

[8] As the Court's justification of its "property" rule seems to center exclusively on the right of homeowners to protest intrusions into their homes it may well be that the rights of owners of business premises should be stringently limited.

with spying for a foreign power. In contrast to the typical situation, here the accused may learn important new information even if the turnover is limited to conversations in which he was a participant. For example, he may learn the location of a listening device—a fact that may be of crucial significance in espionage work. Moreover, he will be entitled to learn this fact even though a valid warrant has subsequently been issued authorizing electronic surveillance at the same location. Similarly, the accused may find out that the United States has obtained certain information that his foreign government believes is still secret, even when our Government has also received this information from an independent source in a constitutional way. And he may learn that those in whom he has been reposing confidence are in fact American undercover agents.

Even more important, there is much less reason to believe that a protective court order will effectively deter the defendant in an espionage case from turning over the new information he has received to those who are not entitled to it. For in an espionage case, the defendant is someone the grand jury has found is likely to have passed secrets to a foreign power. It is one thing to believe that the normal criminal defendant will refuse to pass on information if threatened with severe penalties for unauthorized disclosure. It is quite a different thing to believe that a defendant who is probably a spy will not pass on to the foreign power any additional information he has received.

Moreover, apart from the sense of fair play of most judges, additional safeguards could be devised which would assure that an *in camera* procedure would be used only when an unauthorized disclosure presents a substantial risk to the national security. As in the somewhat analogous situation in which the Government attempts to invoke a national security privilege in a

civil action in order to trigger an *in camera* proceeding, there should "be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States* v. *Reynolds,* 345 U. S. 1, 7–8 (1953). Indeed, I would go even further than did the Court in *Reynolds* and lay upon trial judges the affirmative duty of assuring themselves that the national security interests claimed to justify an *in camera* proceeding are real and not merely colorable.

The Court's failure to consider the special characteristics of the *Ivanov* and *Butenko* cases is particularly surprising in the light of the reasons it gives for creating an absolute rule in favor of an automatic turnover. For the majority properly recognizes that its preference for a full adversary hearing cannot be justified by an easy reference to an absolute principle condemning *in camera* judicial decisions in all situations. Indeed, this Court has expressly authorized the use of such procedures in closely related areas involving the vindication of Fourth Amendment rights. See *Roviaro* v. *United States,* 353 U. S. 53 (1957); *McCray* v. *Illinois,* 386 U. S. 300, 309–313 (1967). If, as the Court rightly states, the propriety of an *in camera* screening procedure is a "matter of judgment," *ante,* at 182, depending on an informed consideration of all the competing factors, I do not understand why the trial judge should not be authorized to consider whether the accused simply cannot be trusted to keep the Government's records confidential. Nor do I understand why the Government must be confronted with the choice of dismissing the indictment or disclosing the information because the accused cannot be counted on to keep faith with the Court.[9] Moreover, it is not

---

[9] I would not, however, go so far as my Brother FORTAS, who would appear to require an *in camera* proceeding in any case in which the Government claims that a turnover would be prejudicial to the national security. I believe that this special procedure is

difficult to imagine cases in which the danger of unauthorized disclosure of important information would clearly outweigh the risk that an error may be made by the trial judge in determining whether a particular conversation is arguably relevant to the pending prosecution. It may well be, for example, that the number of conversations at issue is very small. Yet though the Court itself recognizes that "the need for adversary inquiry is increased by the complexity of the issues presented for adjudication," *ante,* at 184, it nevertheless leaves no room for an informed decision by the trial judge that the risk of error on the facts of a given case is insubstantial. Since the number of espionage cases is small, there is no chance whatever that these decisions will be made in a hurried fashion or that they will not be subjected to the most searching scrutiny on appeal. Of course, if any of the conversations should be found arguably relevant, their disclosure should be required before the prosecution is permitted to continue.

In sum, I would require the Government to turn over to Alderman and Alderisio only the records of those conversations in which each defendant participated, and I would leave the way open for a preliminary *in camera* screening procedure in the *Ivanov* and *Butenko* cases.

MR. JUSTICE FORTAS, concurring in part and dissenting in part.

I.

In the present cases, the Court holds (1) that the Government may use evidence it obtains by unlawful electronic surveillance against any defendant who does not have "standing" to complain; (2) that a defendant has standing only if he was a party to the overheard conver-

---

only justified when the accused has been indicted for his espionage activities, indicating that he has probably passed records to a foreign power.

sation or if it took place on "his premises"; [1] and (3) that all illegally obtained surveillance records as to which a defendant has standing (including national security information) must be submitted to the defendant or his counsel, subject to appropriate protective orders, and their relevance to the defendant's trial must be determined in adversary proceedings. The defendant is entitled to suppression or exclusion from his trial of such illegally obtained information and its fruits.

I find it necessary to file this separate opinion because I believe (1) that a person concerning whom an investigation involving illegal electronic surveillance has been conducted, as well as the persons given "standing" in the majority opinion, has the right to suppression of the illegally obtained material and its fruits; and (2) that it is permissible for the trial judge, subject to suitable specifications, to order that information vital to the national security shall be examined only in camera to determine its relevance or materiality, although I agree that all other information that may be the subject of a motion to suppress must be shown to the defendant or his counsel so that its materiality can be determined in an adversary hearing.

## II.

The effect of the Court's decision, bluntly acknowledged, is to add another to the long list of cases in which the courts have tolerated governmental conduct that violates the Fourth Amendment. The courts have done this by resort to the legalism of "standing." See, e. g., Goldstein v. United States, 316 U. S. 114, 121 (1942); Wong Sun v. United States, 371 U. S. 471 (1963). Cf., United States v. Jeffers, 342 U. S. 48 (1951); Jones v. United States, 362 U. S. 257 (1960); Mancusi v. DeForte, 392 U. S. 364 (1968).

---

[1] The Court leaves the scope of the interest that the defendant must have in the "premises" to be determined in future litigation.

It is a fundamental principle of our constitutional scheme that government, like the individual, is bound by the law. We do not subscribe to the totalitarian principle that the Government is the law, or that it may disregard the law even in pursuit of the lawbreaker. As this Court said in *Mapp* v. *Ohio,* 367 U. S. 643, 659 (1961), "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." [2]

The Fourth Amendment to our Constitution prohibits "unreasonable" governmental interference with the fundamental facet of individual liberty: "[t]he right of the people to be secure in their persons, houses, papers, and effects." Mr. Justice Jackson recognized the central importance of the Fourth Amendment in his dissenting opinion in *Brinegar* v. *United States,* 338 U. S. 160, 180–181 (1949):

"Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the

[2] Mr. Justice Brandeis elaborated this point more than 40 years ago:

"In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. . . ." *Olmstead* v. *United States,* 277 U. S. 438, 485 (1928) (dissenting opinion).

See also *Elkins* v. *United States,* 364 U. S. 206, 222 (1960); *Terry* v. *Ohio,* 392 U. S. 1, 13 (1968); *Goldstein* v. *United States,* 316 U. S. 114, 128 (1942) (dissenting opinion); *Irvine* v. *California,* 347 U. S. 128, 149 (1954) (DOUGLAS, J., dissenting); Comment, The *Benanti* Case: State Wiretap Evidence and the Federal Exclusionary Rule, 57 Col. L. Rev. 1159, 1167–1168 (1957).

individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police."

It is disquieting when an individual policeman, through carelessness or ignorance or in response to the pressure of events, seizes a person or conducts a search without compliance with the standards prescribed by law. It is even more disturbing when law enforcement officers engage in unconstitutional conduct not because of their individual error but pursuant to a calculated institutional policy and directive.

Surreptitious electronic surveillance—the "uninvited ear" as my Brother WHITE calls it—is a "search and seizure" within the ambit of the Fourth Amendment. *Silverman* v. *United States,* 365 U. S. 505, 511 (1961); *Katz* v. *United States,* 389 U. S. 347, 353 (1967). It is usually the product of calculated, official decision rather than the error of an individual agent of the state. And because by nature it is hidden, unlawful electronic surveillance is even more offensive to a free society than the unlawful search and seizure of tangible material.

In recognition of the principle that lawlessness on the part of the Government must be stoutly condemned, this Court has ruled that when such lawless conduct occurs, the Government may not profit from its fruits. *Weeks* v. *United States,* 232 U. S. 383 (1914), held that in a federal prosecution the Government may not use evidence secured through an illegal search and seizure. In *Mapp* v. *Ohio, supra,* the exclusionary rule was applied to the

States. In that case, the Court expressly recognized that only a proscription of the use of unlawfully seized material could properly implement the constitutional prohibition. It acknowledged that other remedies were not effective sanctions. *Id.,* at 651–653. See also *Weeks* v. *United States, supra,* at 393; *Irvine* v. *California,* 347 U. S. 128, 137 (1954); *Wolf* v. *Colorado,* 338 U. S. 25, 41–47 (1949) (dissenting opinion); *People* v. *Cahan,* 44 Cal. 2d 434, 282 P. 2d 905 (1955). As this Court said in *Walder* v. *United States,* 347 U. S. 62, 64–65 (1954), "The Government cannot violate the Fourth Amendment . . . and use the fruits of such unlawful conduct to secure a conviction. . . . [T]hese methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men." [3]

But for reasons which many commentators charge are related more to convenience and judicial prudence than to constitutional principles, courts of all States except California [4] and of the federal system, including this Court, have allowed in evidence material obtained by police agents in direct and acknowledged violation of the Fourth Amendment. They have allowed this evidence except in those cases where a defendant who moves for suppression of the material can show that his personal right of privacy was violated by the unlawful search or seizure. This restriction on persons who can suppress illegally acquired evidence has been attributed by some

---

[3] We pointed out last Term that "[a] ruling admitting evidence in a criminal trial . . . has the necessary effect of legitimizing the conduct which procured the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur." *Terry* v. *Ohio, supra,* n. 2, at 13. See *Irvine* v. *California, supra,* n. 2, at 150 (dissenting opinion).

[4] See *People* v. *Martin,* 45 Cal. 2d 755, 290 P. 2d 855 (1955).

commentators [5] to the fact that the constitutional right to suppress was at one time considered to stem in part from the Fifth Amendment's privilege against self-incrimination.[6] Only the person whose right has been violated can claim the protection of that privilege. 8 J. Wigmore, Evidence §§ 2196, 2270 (McNaughton rev. 1961). But if the exclusionary rule follows from the Fourth Amendment itself, there is no basis for confining its invocation to persons whose right of privacy has been violated by an illegal search. The Fourth Amendment, unlike the Fifth, is couched in terms of a guarantee that the Government will not engage in unreasonable searches and seizures. It is a general prohibition, a fundamental part of the constitutional compact, the observance of which is essential to the welfare of all persons.[7] Accordingly, commentators have urged that the necessary implication of the Fourth Amendment is that any defendant against whom illegally acquired evidence is offered,

---

[5] Broeder, Wong Sun v. United States: A Study in Faith and Hope, 42 Neb. L. Rev. 483, 539, 540 (1963); Comment, Fruit of the Poisonous Tree—A Plea for Relevant Criteria, 115 U. Pa. L. Rev. 1136, 1140–1141 (1967). Others have attributed the standing requirement simply to a hostility towards the exclusionary rule on the part of the courts. See, e. g., Edwards, Standing to Suppress Unreasonably Seized Evidence, 47 Nw. U. L. Rev. 471 (1952).

[6] *Mapp* v. *Ohio,* 367 U. S. 643 (1961), was a 5-to-4 decision. My Brother BLACK concurred only on the basis that the Fifth Amendment's ban against self-incrimination, operating in conjunction with the Fourth Amendment, required the exclusionary rule. See also *Ker* v. *California,* 374 U. S. 23, 30 (1963); *Malloy* v. *Hogan,* 378 U. S. 1, 8 (1964).

[7] The California Supreme Court has recognized that it is not inconsistent to hold that any person may object to the use against him of evidence obtained by an illegal search or seizure, while at the same time allowing only a person who has been made to incriminate himself to suppress his confession and its fruits. Compare *People* v. *Martin, supra,* n. 4, with *People* v. *Varnum,* 66 Cal. 2d 808, 427 P. 2d 772 (1967).

whether or not it was obtained in violation of his right to privacy, may have the evidence excluded. It is also contended that this is the only means to secure the observance of the Fourth Amendment.[8]

I find these arguments cogent and appealing. The Fourth Amendment is not merely a privilege accorded to him whose domain has been lawlessly invaded. It grants the individual a personal right, not to privacy, but to insist that the state utilize only lawful means of proceeding against him. And it is an assurance to all that the Government will exercise its formidable powers to arrest and to investigate only subject to the rule of law. See *Brinegar* v. *United States, supra,* at 181 (dissenting opinion).

To allow anyone, regardless of "standing," to prevent the use against him of evidence that the Government has lawlessly obtained would, however, be contrary to a number of decisions stemming from *Jones* v. *United States, supra. E. g., Wong Sun* v. *United States, supra; Parman* v. *United States,* 130 U. S. App. D. C. 188, 399 F. 2d 559 (1968). · It is the mandate of *Jones* that something more than the generalized interest of any citizen in gov-

---

[8] See generally Grant, Circumventing the Fourth Amendment, 14 So. Cal. L. Rev. 359, 368 (1941); Allen, The Wolf Case: Search and Seizure, Federalism, and the Civil Liberties, 45 Ill. L. Rev. 1, 22 (1950); Kamisar, Illegal Searches or Seizures and Contemporaneous Incriminating Statements: A Dialogue on a Neglected Area of Criminal Procedure, 1961 U. Ill. L. F. 78, 105. Traynor, Mapp v. Ohio at Large in the Fifty States, 1962 Duke L. J. 319, 335; Broeder, *supra,* n. 5, at 540; Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif. L. Rev. 579, 649–650, n. 352 (1968); Comment, Judicial Control of Illegal Search and Seizure, 58 Yale L. J. 144, 157 (1948); Note, Standing to Object to an Unlawful Search and Seizure, 1965 Wash. U. L. Q. 488; Comment, Standing to Object to an Unreasonable Search and Seizure, 34 U. Chi. L. Rev. 342 (1967). But see Edwards, *supra,* n. 5, at 472; Weeks, Standing to Object in the Field of Search and Seizure, 6 Ariz. L. Rev. 65 (1964); Comment, 55 Mich. L. Rev. 567, 581 (1957).

ernmental obedience to law may be required for suppression of unlawfully obtained evidence. But if the Court is not prepared to repudiate the holding, stated in *Jones,* that something more must be shown to compel suppression than a claim of prejudice based only on "the use of evidence gathered as a consequence of a search or seizure directed at someone else," 362 U. S., at 261, it should at least follow *Jones* faithfully and completely.

*Jones* represented a substantial step towards full implementation of the Fourth Amendment. The case involved a charge of illegal possession of narcotics, and it held that mere lawful presence on the premises searched gave "standing" to challenge the legality of the search.[9] It rejected the view "generally" held by courts of appeals "that the movant [must] claim either to have owned or possessed the seized property or to have had a substantial possessory interest in the premises searched" in order to have the seized property suppressed. *Ibid.* It explicitly rejected the use of property concepts to determine whether the movant had the necessary "interest" or "standing" to obtain exclusion of the unlawfully seized evidence. See *id.,* at 266.

The Court said in *Jones,* in a passage the majority quotes but the full scope of which it does not incorporate in its opinion:

> "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, *one against whom the search was directed,* as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. . . .

· · · · ·

[9] I assume that the Court today intends to incorporate at least this direct holding of *Jones.*

"Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy." (Emphasis supplied.) *Id.*, at 261.

It is my position that this quotation, read in light of the Court's rejection of property concepts, requires that we include within the category of those who may object to the introduction of illegal evidence "one against whom the search was directed." Such a person is surely "the victim of an invasion of privacy"[10] and a "person ag-

---

[10] Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90–351, 82 Stat. 211, provides that a law enforcement officer seeking prior judicial authorization for interception of wire or oral communications shall include, among other things, in his application to the court "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted . . . ." 82 Stat. 218 (18 U. S. C. § 2518 (1) (b) (1964 ed., Supp. IV)). Examination of such applications should facilitate the task of deciding at whom a particular investigation was directed. See also *Berger* v. *New York*, 388 U. S. 41, 55–59 (1967), in which we held that the Fourth Amendment requires, as a precondition of judicial authorization of an eavesdrop, that the conversations sought to be seized be described with particularity.

Although I have referred to relevant provisions of the Omnibus Crime Control and Safe Streets Act, I note that I have not considered the constitutionality of the Act, as that issue is not involved in this case. I express neither agreement nor disagreement with the majority's statements concerning the Act.

grieved," even though it is not his property that was searched or seized. As I think the Court recognized in *Jones,* unless we are to insist upon property concepts, it is enough to give him "standing" to object that the government agents conducted their unlawful search and seizure in order to obtain evidence to use against him. The Government violates his rights when it seeks to deprive him of his liberty by unlawfully seizing evidence in the course of an investigation of him and using it against him at trial. See *Rosencranz* v. *United States,* 334 F. 2d 738, 741 (C. A. 1st Cir. 1964) (concurring opinion).

### III.

I do not agree with the Court's decision that sensitive national security material that may not be relevant to a defendant's prosecution must be turned over to the defendant or his counsel for their scrutiny. By the term "national security material," I mean to refer to a rigid and limited category. It would not include material relating to any activities except those specifically directed to acts of sabotage, espionage, or aggression by or on behalf of foreign states.

Because the Court believes that no distinction can be made with respect to the defendant's right to suppress relevant evidence on the basis of the sensitivity of the material, it has concluded that no distinction can be made as to the method of determining whether the material is relevant. I agree that an *in camera* inspection of the records of unlawful surveillance should not be the usual method of determining relevance. I agree with all that the Court says about the inadequacy of an inspection in which the defendant cannot participate and the burden that it places upon the trial judge. But in cases where the trial court explicitly determines, in written findings, sealed and available for examination by

reviewing courts, that disclosure would substantially injure national security interests, I do not think that disclosure to the defendant is necessary in order for the Government to proceed with a prosecution. The trial judge should make such findings only when the Attorney General has personally certified that specific portions of the unlawfully obtained materials are so sensitive that they should not be disclosed. But when such a certification is made, I believe that the trial judge may himself weed out the material that he deems to be clearly irrelevant and immaterial. The balance, of course, must be turned over to the defendant or his counsel, unless the Government chooses instead to dismiss the prosecution.

Let me emphasize that the defendant's right to suppress is the same whether the charge is espionage, sabotage, or another kind of crime: Relevant material that has been illegally seized may be suppressed if the defendant has standing, but the existence of nonrelevant illegal evidence will not prevent a prosecution. Only the method of determining the relevance of the lawlessly obtained material to the prosecution would vary according to whether the national security is involved.

I agree with the majority that the possibility of error in determining relevance is much greater if there is only *in camera* examination. But I also agree with my Brother HARLAN that disclosure of some of the material may pose a serious danger to the national interest. I therefore reach the conclusion that a differentiation may properly be made between the method of handling materials the disclosure of which would endanger the national security and other illegally obtained materials. Skepticism as to the court's ability to detect and turn over to the defendant all relevant material may be well founded, but *in camera* inspection does not so clearly threaten to deprive defendants of their constitutional rights that it justifies endangering the national security. Accordingly, I would

hold that after certification by the Attorney General that specific portions of unlawfully obtained materials are sensitive, the trial judge may find that their disclosure to the defendant or his counsel would substantially injure national security interests, and he may determine *in camera* whether the materials are arguably relevant to the defendant's prosecution.