**Maurice Carlton HILL, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**George Earl GRAHAM, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**Nos. A–16284, A–16496.**

Court of Criminal Appeals of Oklahoma.

Aug. 30, 1972.

Doyle C. Scott, Scott, Groom, Woody & Harley, Oklahoma City, for appellants.

Larry Derryberry, Atty. Gen., Fred Anderson, Asst. Atty. Gen., for appellee.

SIMMS, Judge:

Appellants, and each of them, were charged by separate informations for the burglary of a grocery store in the town of Dacoma, Woods County, Oklahoma. Appellants were separately tried before different juries, and each found guilty of the crime of Burglary in the Second Degree, and sentenced to a term of Two Years in accordance with the separate jury verdicts. Each appellant has perfected a timely appeal to this Court.

Because the separate charges arose from the same alleged burglary, and because, with but one exception, the propositions of error raised by each individual defendant are identical, these appeals have been consolidated for the purposes of this opinion.

At trial, both the owner-operator, and an employee of Whittet's Grocery and Locker, located in Dacoma, were called to testify, and established that on the night of March 2nd, 1970, or the early morning hours of March 3rd, 1970, entry had been made into the grocery store by a forcible entry thru the back door of the building.

The testimony reflects that a number of food items, cartons of cigarettes, an adding machine, a transistor radio, and several skinning and meat-cutting knives were missing from the establishment. At the trial of Appellant Hill, the owner as well, identified with particularity, State's Exhibit No. 7, which was a glass quart jar of "Santa Fe Mustard."

Marvin Randall Pack, a confessed participant and admitted accomplice in the burglary in question, testified for the State in each of the separate trials. Pack testified that a little before midnight, March 2nd, he, each of the appellants, and Jerry

Noble, all left Pack's apartment, located in Alva, Oklahoma, in Pack's 1970 Pontiac GTO automobile, which bore Oklahoma license number WW–7037. The automobile was described as being red with a white top. Pack related that after leaving his apartment, the four went together to a gas station where they purchased some .22 shells, headed down a country road to around Hopeton and then drove back into Waynoka. They arrived in Waynoka at approximately 1:00 A.M. The reason for their being in Waynoka, according to Pack, was they were looking for gas.

At the trial of Appellant Graham, Pack testified that while they were in Waynoka, Graham left the car and while Graham was absent from the car, Pack and the other occupants of the vehicle saw a Waynoka Police Officer coming and they "took off" and left Graham afoot. Pack related that they drove the automobile about a mile north of town and then came back into town the same way they had arrived, picked Graham up and then the Waynoka Police Officer followed the car for a mile or two out of town. It is to be noted, that at the trial of Hill, this incident was not alluded to by the witness.

After leaving Waynoka, they went to Carmen, Oklahoma, and thence to Dacoma, where the burglary occurred.

Describing the actual burglary, Pack testified that after arriving in Dacoma, Graham, Hill, and he, Pack, alighted from the Pontiac automobile and found a door on the south side of the building which they kicked in, knocking down some pop bottles. After entering the store, Graham went to the cash register part of the store and Pack began looking for a locker. Hill, according to his accomplice, was carrying a basket through the store aisles, placing food items in the basket as he walked. Pack loaded one basket of items into the back of the car, returned to the store, where Mr. Graham was getting meat and other items off the counter, which they loaded into a basket, and also loaded in the car. According to Pack, all four left in the automobile headed for Pack's apartment in Alva.

After arriving at the apartment, occupied by Pack and one Rick Maggard, all of the stolen items were taken out of the back seat of the automobile and into the house, where they were there divided.

A quantity of canned goods and the adding machine were left in the apartment, together with meat, several packages of bacon and ham. The radio, and a quantity of food items were placed in a basket, and then placed in the trunk of the automobile where they were to be taken to Hill's apartment and left for future use by the participants in the burglary.

According to the undisputed testimony in both trials, after leaving the apartment occupied jointly by Pack and Maggard, the four alleged participants in the burglary, on the way to Hill's apartment, stopped at a restaurant in Alva to eat breakfast. As the four left the restaurant after finishing breakfast, there was an Alva Police Officer waiting and the officer requested the four follow him to the police station. After arriving at the Alva Police Station, each of the four were placed in physical custody.

John Lewis, who testified at both trials, related that on the evening of March 2nd, 1970, he saw Pack, Noble, Hill and Graham together in the apartment occupied by Pack and Maggard. That the four left together between 12:00 and 12:30 A.M., and later in the night, while he was asleep, he was awakened by Pack's voice. There was someone with Pack, although Lewis could not identify the person or persons in the apartment with Pack at that time.

Police Officer Eugene Boller of Waynoka testified that he was working on the 11:00 P.M. to 7:00 A.M. shift on the night of March 2nd, and morning of March 3rd, 1970. That between one and one-thirty A.M., he observed a "colored fellow" leaving an alley and getting into an automobile, which proceeded to leave. The automobile was described by Boller as being a white over red GTO Pontiac, bearing Woodward County tag number WW–7037. A tag check reflected that the license number was registered to Marvin Randall Pack.

Alva Police Officer Dwayne Wagner testified, in essence, in both cases, that he was notified by his radio dispatcher to be on the watch for a 1970 Pontiac GTO, bearing Woodward County plates, occupied by four persons, and to hold the occupants of the vehicle for questioning. He testified that he observed Noble, Pack, Graham, and Hill in Pack's automobile at approximately 4:00 A.M. at Pangburn's Cafe in Alva. After observing the vehicle, the four named individuals, he requested they follow him to the police station, which they did.

Alfalfa County Sheriff Delmar Coppock testified, in both cases, that at approximately 1:00 A.M., March 3rd, 1970, he was called out to investigate an Alfalfa County burglary. Sheriff Coppock also related that he was in the Alva Police Station at approximately 6:00 A.M., the same morning, and that at approximately 9:50 A.M., March 3rd, he, the District Attorney of Woods County, and the Woods County Sheriff went to the apartment occupied by Pack and Maggard, where they obtained a written consent to search from Ricky Maggard.

A search of the apartment revealed numerous food items in the refrigerator, and they also recovered from the apartment an adding machine, cigarettes, coins, and other items.

Woods County Sheriff Clyde A. Vore testified in both trials that he participated in the search of Pack and Maggard's apartment, and in the trial of Hill, the Sheriff described a 32 oz. glass jar of "Santa Fe Pure Solid Mustard" as being one of the items recovered in the search of the apartment.

At the trial of Graham, Arlo Darr, Woods County Deputy Sheriff, testified he assisted in a search of the 1969 Pontiac in question under authority of a search warrant issued by a Woods County Associate District Judge. The witness, as well, identified the inventory of items taken in the search which was attached to the return of the search warrant.

At the trial of Hill, however, Arlo Darr testified only as to obtaining fingerprint exemplars of Maurice Hill at approximately 2:00 P.M. on March 3rd. On cross-examination, Darr stated that he did not advise Hill of any of his rights prior to the taking of the fingerprints, however, Darr related to the jury that Hill has signed a "Waiver of his Rights."

Rex Davis, an employee of the Woods County Sheriff's Office, also testified in both trials that on the morning of March 3rd, he went to Dacoma where he talked to the owner of the grocery store which had been burglarized, and obtained a list of items that were thought to have been taken in the burglary. That thereafter he was present when Marvin Randall Pack was questioned regarding stolen property. That in the conversation Pack related where some of the items taken in the burglary were located. Thereafter, the witness executed an affidavit for search warrant for the automobile belonging to Pack. However, the witness did not participate in the search of the automobile.

Appellant, George Earl Graham, testified in his own defense, and related to the jury that he was a graduate of Douglass Senior High School in Oklahoma City, in which city his mother and father still resided. That during the summer prior to trial, he had worked for the Oklahoma City Board of Education as a recreational leader at the Inman-Page Elementary School. That at the time of the alleged burglary, he was a student at Northwestern State College, Alva; and the following year would be attending Central State College as a senior. Graham testified, that on the night and morning of the burglary, he was, in fact, in company of Pack, Hill, and Noble. He testified, however, that at the time of the alleged burglary he was asleep in the automobile and had no knowledge of the burglary being committed. He further testified that he did help Pack and the others involved in the burglary carry the stolen goods from the automobile into Pack's apartment and he also admitted be-

ing present in the apartment when the property was divided.

Appellant Hill did not testify in his own defense.

At Hill's trial, in addition to the evidence above set forth in this opinion, Larry Peters, a fingerprint technician for the Oklahoma State Bureau of Investigation, testified that on the morning of March 4th, 1970, he received certain food articles from Woods County Deputy Sheriff Rex Davis. Peters testified that he processed the various articles for latent fingerprints and was able to find a latent fingerprint on the "Santa Fe Pure Solid Mustard jar." He was also furnished the fingerprint card of Maurice C. Hill. His testimony was that the fingerprint removed from the mustard jar was found to be identical with the number four finger of Appellant Hill.

Appellants, and each of them, assert as Proposition I in their briefs, that their arrest was unlawful, illegal, and without reason.

A determination of this issue first requires that we establish when the arrest was effected.

Title 22, O.S.1971, § 190, provides:

"An arrest is made by an actual restraint of the person of the defendant, or by his submission to the custody of the officer."

Although Alva Police Officer Wagner did not testify either on direct or cross-examination either trial that he "arrested" the appellants and their accomplices after they had left Pangburn's Cafe, nonetheless, the substance of what occurred may be found in Wagner's testimony in the Hill transcript at pages 110 and 111:

"Q. Where were they?

A. They was coming out of the cafe.

Q. What, if any, conversation did you have with them there?

A. Only one I talked to was Randy.

Q. What did you say to him?

A. Asked him if he would come down to the police department for some questioning.

Q. For what?

A. For some questioning.

Q. What did he say?

A. He said, 'Yes, he would'.

Q. And then they all went over and got in his car and followed you down there?

A. Well, I followed them down there.

* * * * * *

Q. Had you placed these young men under arrest?

A. No, sir.

Q. Were they in your custody?

A. No, sir.

Q. Were they free to leave?

A. No, sir.

Q. Did you inform them that they could leave if they wanted to?

A. No, sir.

Q. Or that they could not leave?

A. I didn't talk to them much."

And, at page 113, we find the following testimony on the part of Officer Wagner:

"Q. Then in relay-terms they were in your custody, correct?

A. Not at that time, I don't believe.

Q. Were they free to leave?

A. No, I wouldn't say they were free to leave.

Q. If they were not free to leave and they were not in your custody then what were they?

A. They could have probably tried to leave.

Q. And if they tried to leave, what would you have done?

A. I would have probably arrested them."

■ Unquestionably, the arrest of the four individuals was effected at that point in time when the officer, acting under color of authority, directed that the four alleged participants in the burglary go to the Alva Police Department. This is especially true, because the four submitted to the color of authority of the officer. Obviously, they

were not free to travel in a direction other than toward the Alva Police Station, without being impeded by the officer. See, Hoppes v. State, 70 Okl.Cr. 179, 105 P.2d 433; and, Patty v. State, 74 Okl.Cr. 322, 125 P.2d 784.

The ensuing question presented is, "Did Officer Wagner legally have probable cause to effect the arrest at the time and place the same was effected?"

Each of the trial transcripts submitted in the separate appeals were, in an evidentiary sense, incomplete upon this issue. Therefore, this Court on October 29, 1971, entered an order directing an Evidentiary Hearing be conducted in the Woods County District Court and receive evidence upon the following designated questions:

1. Was Officer Dwayne Wagner, of the Alva Police Department adequately advised of the fact that a felony had been committed in Waynoka, Oklahoma?

2. Did Officer Wayne Bolar of the Waynoka Police Department adequately describe the suspects and/or the car they were driving which he believed had committed this felonious breaking and entering?

3. Were there facts presented to the trial court at any stage of the proceeding which are not a part of this record, that would establish probable cause for the arrest of these defendants?

In accordance with the October 29, 1971, Order of this Court, an Evidentiary Hearing was conducted on January 5, 1972, before the Honorable J. Russell Swanson, District Judge, Woods County, Oklahoma.

At this evidentiary hearing, first called to testify was Wayne Bolar. Bolar's testimony at the Evidentiary Hearing was, in substance, that between 1:15 and 1:30 A.M. on the morning of March 3rd, he was making his nightly rounds in the town of Waynoka, shaking doors in the alley in back of Evelyn's Flower Shop. While shaking doors in the alley, he observed a person he described as a "negro, approximately six feet" leaving out of the alley. Bolar testified he observed the person who left the

alley proceed a block and a half eastward to "Highway 281" where the person was picked up by a white over red GTO Pontiac automobile. Bolar testified he got in his police car and pursued the Pontiac automobile until he obtained the tag number. After getting the tag number, he returned to the area where he had been checking doors and found that the screen door on the flower shop had been torn loose and the door kicked in.

At this point, the officer notified his dispatcher to "call Alva" and have the car stopped for questioning.

The next witness to testify at the Evidentiary Hearing was Jesse James, who on March 3rd, 1970, was City Marshal at Carmen. The Marshal testified that at approximately 1:30 A.M., March 3rd, he discovered that Curry's Hardware in Carmen had been broken into, and thereafter he notified the Alva Police Department by radio that there had been only one car in town that night, and described the automobile as a white over red GTO automobile, new model.

Officer Dwayne Wagner also was called at the Evidentiary Hearing, and his testimony was that he was notified by the Alva Police Dispatcher that a burglary had been committed in Waynoka and to be on the lookout for a white over red GTO Pontiac; he was given the license number of the automobile, and the dispatcher described the occupants of the sought automobile as being two white boys and two colored boys. Dispatcher told witness, "Be on the lookout for them, if you see them, pick them up or hold them." He further testified at the Evidentiary Hearing, as he did at trial, that he saw the vehicle and the four suspects leaving Pangburn's Cafe at approximately 4:00 A.M., March 3rd, and get into the Pontiac automobile. At which point he had them proceed to the police station.

Officer Wagner testified, however, that he had not received any information pertaining to the alleged burglary in Carmen, nor had he received information or knowledge concerning the burglary at Dacoma,

which was the subject of the charge upon which each defendant was convicted.

Sheriff Vore was also called to testify in the Evidentiary Hearing and related, in essence, that at the time Hill, Graham, Pack, and Noble were brought to the Alva Police Station, and subsequently questioned by the Sheriff, Woods County authorities had no knowledge of the Dacoma burglary. Factually, they were initially being interrogated concerning the Carmen and Waynoka burglaries. He testified that they had no knowledge of the Dacoma burglary until near the hour of 8:00 A.M., March 3rd.

From the entire record before us, we can only conclude, that at the time the four individuals were taken into custody outside Pangburn's Cafe, the arresting officer had only knowledge of a supposed burglary in Waynoka, and had no knowledge of the commission of any burglary in Dacoma, for which the defendants stood trial.

█ The legal right of Officer Wagner to effect the arrest in front of the cafe is clearly governed by McKay v. State, Okl. Cr., 472 P.2d 445 (1970). This Court, in *McKay*, supra, stated:

"An arrest based on information received from the police dispatcher that a burglary had been committed, describing the burglars, the automobile in which they left the scene, and the license number of said automobile was based on reasonable cause and was therefore a lawful arrest."

Because this Court has stated repeatedly that an officer may at night, without a warrant, arrest any person he has reasonable cause for believing to have committed a felony, and is justified in making the arrest though it afterward appear that the felony had not been committed. Trusty v. State, Okl.Cr., 395 P.2d 350; Russell v. State, Okl.Cr., 433 P.2d 520 (1967).

█ It must logically follow that the subsequent discovery by police officers of a commission of a felony other than that for which the defendant was lawfully arrested, does not render the initial lawful arrest to be invalid.

█ Appellants, and each of them, under Proposition II of their briefs, assert that their constitutional rights were violated in that the arresting officers failed to give each of appellants the proper constitutionally required Miranda warning. Under this assignment of error, they additionally attempt to argue that the statement given by the accomplice, Pack, was not preceded by proper Miranda warning.

Neither evidence nor information enured to the benefit of prosecutorial personnel from any questioning of either Hill or Graham.

Relying upon the restrictive language used by the Supreme Court of the United States in Massiah v. United States, (1964) 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, the Supreme Court of California categorically held that there was no basis for excluding physical or other non-hearsay evidence acquired as a result of questioning a suspect in disregard of his Fifth and Sixth Amendment rights when such evidence is offered at the trial of another person.

The United States Court of Appeals, 8th Circuit, in United States v. Bruton, 416 F. 2d 310 (1969). cert. den. 397 U.S. 1014, 90 S.Ct. 1248, 25 L.Ed.2d 428, pointedly held that a defendant lacks standing to challenge the testimony of a co-participant who implicated a defendant in armed robbery of a post office on the grounds such testimony was unconstitutionally tainted by illegality of co-participant's prior confession. *Bruton*, supra, was cited with approval and followed in United States v. Schennault, E. S.C.A., 7th Circuit, (1970) 429 F.2d 852, holding that statements of a co-edefendant which were obtained under circumstances which would have rendered them inadmissible against said co-defendant, did not preclude the use of the statements against defendant. See, also, Bowman v. United States, 350 F.2d 913 (9 Cir., 1965), cert. den. 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1965).

Also, United States ex rel. Falconer v. Pate, 319 F.Supp. 206 (D.C.1970), citing *Bruton*, supra; and, Alderman v. United

States, 394 U.S. 165, 89 S.Ct. 961, 22 L. Ed.2d 176 (1969). "Fifth Amendment rights of co-conspirators are strictly personal to them and one has a vested interest only in his own Fifth Amendment rights."

■ We must, therefore, conclude that the Fifth Amendment rights against self-incrimination, as protected by Miranda are personal in nature and may not be vicariously asserted.

Appellant Hill additionally urges under Proposition II that he was not advised of his Miranda rights before the officers obtained fingerprint card of Hill's, which was introduced into evidence over his objection. Hill asserts that without this fingerprint card, the evidence would be insufficient to sustain the conviction.

■■ Clearly, the obtaining of fingerprint evidence from a suspect or defendant is subject to the proscriptions of the Fourth and Fourteenth Amendments of the Federal Constitution. Fingerprints obtained from a defendant while being detained in police custody *without probable cause* for his arrest are inadmissible at trial, and, also, fingerprints obtained from a person in custody for the *sole purpose* of obtaining his fingerprints, without more, are inadmissible at the trial of the case. Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Hill, having been placed in custody pursuant to an arrest based upon probable cause, as we have concluded in this opinion, may not now complain that his Fourth Amendment rights have been violated.

As pertains to Hill's Fifth and Sixth Amendment rights, the trial record reflects that he was given no Fifth or Sixth Amendment warnings by the person who took Hill's fingerprint exemplars. However, the record of the subsequent Evidentiary Hearing reflects that he did sign a "Rights Waiver Form" which contains an explanation of Appellant Hill's Fifth and Sixth Amendment rights.

■ In any event, the failure of prosecutorial personnel to adequately advise a person lawfully in custody of his Fifth and Sixth Amendment rights does not defeat the introduction into evidence of fingerprint exemplars.

■ It was recognized that identification procedures requiring fingerprinting do not infringe the Fifth Amendment privilege against self-incrimination. United States v. Serao (1966, C.A.2 N.Y.) 367 F. 2d 347, vacated on other grounds, 390 U.S. 202, 88 S.Ct. 899, 19 L.Ed.2d 1034. Also, in Woods v. United States (1968, C.A.9 Cal.) 397 F.2d 156, the Court, in affirming a bank robbery conviction, held that the taking of the accused's fingerprint exemplar in the absence of counsel did not violate his Fifth Amendment right against self-incrimination nor his Sixth Amendment right to counsel.

Further, we held in Lester v. State, Okl. Cr., 416 P.2d 52 (1966), syllabus three by the Court:

"Fingerprinting is not considered within the privilege against self-incrimination."

We, therefore, conclude that Appellant Hill's assertion of a violation of constitutional rights in taking his fingerprints following an arrest based on probable cause, is without merit.

■ In their Third Proposition, appellants urge the trial court erred in admitting evidence obtained in the search of their accomplice's apartment and the automobile belonging to Pack. In this connection, the record is devoid of any evidence indicating that either of the appellants had a proprietary right or interest in the apartment or the automobile in question, nor does the record reflect that either of appellants had any legal custody or control over either the apartment or the automobile. Likewise, the entire evidence negates any finding that either of appellants were the persons against whom the search was directed.

In *Alderman*, supra, the Supreme Court of the United States held that co-conspirators or co-defendants who had no possessory interest in the premises searched could not assert their standing to object to an illegal search unless they were the

person against whom the search was directed. The Court, in limiting the exclusionary rule, stated:

"* * * suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing."

The following language is also found in *Alderman*, supra, in 394 U.S. at 174, 89 S. Ct. at 966. 22 L.Ed.2d at 186:

"We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. [citations omitted] * * * There is no necessity to exclude evidence against one defendant in order to protect the rights of another. No rights of the victim of an illegal search are at stake and the evidence is offered against some other party. The victim can and very probably will object for himself when and if it becomes important for him to do so."

This Court applied *Alderman*, supra, in Caskey v. State, Okl.Cr., 496 P.2d 408 (1972).

We therefore conclude that neither of appellants had standing to object to the search of Maggard's apartment or of the search of Pack's automobile and their Third Proposition of error is without merit.

Appellant's numerical Proposition IV and V are summarized in Proposition III of the conclusions in their brief, to-wit: "The fruit of the poisonous tree" doctrine should have been invoked thereby leaving the accomplice's testimony uncorroborated.

Appellants argue that by reason of the fact that the accomplice Pack was not given an adequate Miranda warning, any evidence obtained therefrom would not be admissible in evidence as against appellants.

 Appellants rely most heavily in their brief upon the case of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Their reliance is mis-placed. Referring, again to United States v. Bruton, supra, that Court noted that the aspect of *Alderman*, supra, dealing with standing was at least in part an outgrowth of the personal nature of certain constitutional rights, there the Fourth Amendment's guaranty against unreasonable searches and seizures. As the Fifth Amendment's right to be free from self-incrimination is likewise a personal right, Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951); Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L. Ed. 652 (1906), the Bruton Court decided that the defendant had no standing to attack the evidence poisoned by the constitutional deprivation of another, irrespective of the fact that such evidence seriously implicated the defendant.

 We agree with the rationale of the Bruton Court. The personal nature of the Fifth Amendment guaranty manifestly precludes appellants from claiming any error because of Pack's alleged deprivation. The only potential prejudice arising from the introduction into evidence of property taken in the burglary, the fruit of the confrontation, would have accrued solely to Pack. Fifth Amendment rights of co-defendants are strictly personal to them and one has a vested interest in his own Fifth Amendment rights.

Under Proposition V in Appellant Graham's brief, it is urged that the testimony of the accomplice, Pack, is uncorroborated and as a result thereof, the evidence was insufficient to convict Graham.

This assertion is governed by Turci v. State, Okl.Cr., 482 P.2d 611 (1971). Turci was convicted of burglary in the second degree, after former conviction of a felony. He was arrested in an automobile with two other persons, and the automobile contained firearms taken in the burglary. At trial, one of the persons arrested in the automobile, an accomplice, testified against

the defendant. We therein held that there was corroboration by independent evidence of material facts that connected the defendant with the commission of the crime.

Insofar as Appellant Hill is concerned, we must re-iterate that a latent fingerprint of Hill's was found on the jar of mustard taken in the search of Maggard's apartment. Such fingerprint evidence clearly is corroborative of the testimony of Pack.

█ It is not essential that evidence corroborating an accomplice cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty, and if the accomplice is corroborated as to some material fact by independent evidence tending to connect defendant with the crime, the jury may from that infer that he speaks the truth to all, such corroborating evidence must show more than the mere commission of the offense or circumstance thereof, in view of 22 O.S.1961, § 742. See, *Turci*, supra.

█ We therefore find that Pack's testimony was, as a matter of law, corroborated sufficiently to place a fact question before a jury.

█ Proposition VI, in both briefs, asserts a mis-use of procedure in that there was bad faith prosecution. This argument is bottomed upon the Woods County District Attorney, or his Assistant, making a so-called "deal" with the accomplice to get him to testify. Neither appellant cites authority in support of this proposition, however, suffice it to say, all circumstances surrounding Pack's testimony was properly laid before the jury.

█ Appellant Hill's Seventh Proposition argues misconduct on the part of the prosecuting attorney in his closing argument to the jury. A review of the transcript reflects that no objection was made to the complained-of remarks of the prosecuting attorney during final argument.

In Robison v. State, Okl.Cr., 430 P.2d 814 (1967), this Court stated:

"When objectionable statement is made by the prosecution, it should be called to the attention of the court by timely objection, together with a request that the jury be instructed to disregard the improper statement and in the event objection is overruled, an exception should be taken to the ruling of the court, preserved and argued in the Motion for New Trial."

This rule of law has been followed in Walters v. State, Okl.Cr., 455 P.2d 702 (1969); and, Byrnes v. State, Okl.Cr., 451 P.2d 19 (1969).

█ The final proposition of error asserts the verdict and sentence to be excessive and should be reduced to fit the crime. We need but observe that the appellants, and each of them, received the minimum statutory sentence. However, under this proposition, appellants argue that the instigator of the crime, Pack, received a deferred sentence, while each of appellants did not receive any type of probationary consideration by the trial court.

The record is silent as to the reasons the trial court may or may not have seen fit to grant a probationary status to appellants, however, it is axiomatic that the matter of probation rests largely in the discretion of the trial court, and the judgment of the trial court will not be disturbed in such matters unless there be a clear abuse of discretion. No such abuse of discretion is shown in the record in either of these cases.

We direct counsel's attention to the provisions of 22 O.S.1971, § 994.

Finding no prejudicial error in the trial of either of appellants, the judgment and sentence imposed on appellants, and each of them, is hereby affirmed.

BUSSEY, P. J., and BRETT, J., concur.