472

Frederick Lee HUBBARD and Richard
WILLIS, Jr. *v.* STATE of Arkansas

CR 75-55                                    527 S.W. 2d 608

Opinion delivered September 2, 1975
[Rehearing denied October 6, 1975.]

*Jeff Duty,* for appellants.

*Jim Guy Tucker,* Atty. Gen., by: *Gary Isbell,* Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. Frederick Lee Hubbard and Richard Willis, Jr., appeal from a conviction for burglary

and grand larceny committed at Carroll Electric Co-op's warehouse. Each received concurrent 21-year sentences with 12 years suspended. The six points for reversal present in substance three questions.

The material facts are hardly in dispute. On February 10, 1974, four men — Hubbard, Willis, Russell Brewer, and Burlin Witcher — drove to Bentonville from Missouri with the intention of stealing copper, which was readily salable, and taking it back to Missouri. The men made their headquarters at the home of Witcher's wife, Dora, near the courthouse in downtown Bentonville. That afternoon they drove around together and spotted two places where quantities of copper might be found: Wilkes Construction Company, in Rogers, and Carroll Electric, in Bentonville.

After dark the four men drove to Rogers in a pick-up truck, burglarized the Wilkes place of business, returned to Bentonville, and left the stolen goods in Hubbard's car at Dora Witcher's house. At about midnight they drove to the Carroll Electric warehouse and spent several hours in loading the pick-up truck with a number of tools and more than 1,500 pounds of copper wire.

The men then started back to the Witcher house. Near the courthouse the overloaded truck aroused the suspicion of Officer Foster, a city patrolman on night duty. Burlin Witcher, upon seeing the officer, turned into a residential driveway and let the other three men get out of the vehicle. Officer Foster got a good look at Hubbard, near a street light. Witcher became alarmed and took off in an attempt to escape the officer. After a brief chase Witcher's truck overturned in an open field. Officer Foster radioed for assistance, and Witcher was taken into custody. The stolen merchandise was identified as having come from the Carroll Electric warehouse, which had obviously been burglarized.

In the meantime the other three men made their way back to the Witcher residence. They decided to take another vehicle and see what had happened to Witcher. As they approached the site of Witcher's accident they saw police cars and thought it best to return to Dora Witcher's house and go

to bed. A police officer found the men there early in the morning.

Two days later all four men were charged with the burglary and theft at Carroll Electric. Hubbard and Willis were tried together. Brewer testified for the State, narrating many of the facts that we have set forth.

Three of the points for reversal arise from an incident during the cross-examination of Brewer. On direct examination there had been no reference to Wilkes Construction Company or to the burglary there. On cross-examination, however, defense counsel inquired about the afternoon visit to Wilkes, including the men's having "cased the joint." Counsel also asked about the second trip to Wilkes that night, though not mentioning the burglary. The interrogation continued to follow the sequence of events until this interchange occurred:

Q. Well, what time did you come back to Bentonville?

A. I figure around ten-thirty or eleven.

Q. And where did you go then?

A. To the house. Dora's house.

Q. Witcher's house again?

A. Yes, sir.

Q. How long did you stay at Witcher's house?

A. Just long enough to get all the stuff out of the pick-up and put it in Freddie's car, from Wilkes.

Q. From what?

A. From Wilkes Construction.

Mr. Duty: I ask that that be stricken, Your Honor.

The Court: Denied. You inquired into it.

Mr. Duty: I asked him how long he stayed at the Witcher house.

The Court: Well, that's all right.

Mr. Duty: Save our exceptions. Well, he's not charged with that, but I'm asking the court to make my record that the court instruct the jury that he is not charged with anything except this one.

The Court: All we're trying is the charge on this one incident.

Later on the prosecuting attorney referred to the matter in his closing argument. The court overruled Mr. Duty's request that the reference be stricken.

It is argued, on the authority of cases such as *Alford* v. *State,* 223 Ark. 330, 266 S.W. 2d 804 (1954), that Brewer's answer should have been stricken, because it referred to another criminal offense. We do not agree. In the first place, counsel had already alluded to the other burglary by asking Brewer if the men had cased the joint and by bringing out their second visit to Wilkes after dark. The cat was already almost completely out of the bag. Secondly, the answer was responsive to the question, "How long did you stay at Witcher's house?" That question did not necessarily call for an answer in terms of minutes or hours. It is not error for the court to refuse to exclude a responsive answer on cross-examination. *Ark. Power & Light Co.* v. *Harper,* 249 Ark. 606, 460 S.W. 2d 75 (1970). Inasmuch as the testimony was properly before the jury, the prosecutor was entitled to mention it in his closing argument.

In two points for reversal it is argued that the testimony of Brewer, an accomplice, was not corroborated by other evidence tending to connect Hubbard and Willis with the commission of the offense. Ark. Stat. Ann. § 43-2116 (Repl. 1964). We find the State's corroborating testimony to be adequate. Dora Witcher testified that her husband, Brewer,

Hubbard, and Willis were together during that day. She said that the four left the house at about eleven o'clock that night and that Brewer, Hubbard, and Willis returned. The burglary was shown to have taken place during the night. Officer Foster saw four men in the truck after the burglary and identified Witcher and Hubbard. Thus there was adequate corroborating testimony to justify the jury in finding that the four men committed the crimes together. For somewhat similar cases, involving the participants' association before and after the offense, see *State* v. *Bassett*, 86 Ida. 277, 385 P. 2d 246 (1963); *Lomp* v. *State*, 231 Md. 537, 191 A. 2d 224 (1963); *People* v. *Kress*, 284 N.Y. 452, 31 N.E. 2d 898 (1940); *Hill* v. *State*, Okl. Cr., 500 P. 2d 1080 (1972).

The sixth point for reversal relates to defense counsel's request that Officer Prather be recalled for cross-examination. The officer could not be recalled at once because, although he had been subpoenaed by the prosecution and not released, he had gone to Oklahoma after he first testified. The court did not abuse its discretion in refusing to delay the trial, because the proffered additional testimony was merely cumulative and, as far as the record shows, could have been elicited by cross-examination in the first instance.

Affirmed.