**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Pedro ALVILLAR, Jr., a/k/a Pete Martinez, Defendant-Appellant.**

**No. 77–1350.**

United States Court of Appeals, Tenth Circuit.

May 18, 1978.

Anthony F. Avallone, Las Cruces, N. M., for defendant-appellant.

Charles F. Sandoval, Asst. U. S. Atty., Albuquerque, N. M. (Victor Ortega, U. S. Atty., Albuquerque, N. M., on brief), for plaintiff-appellee.

Before SETH, Chief Judge, and HOLLOWAY and McKAY, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant-Appellant Pedro Alvillar, Jr., was convicted in March 1977 on a jury verdict for causing transportation of three illegal aliens within the United States in violation of 8 U.S.C. § 1324(a)(2)[1] and 18 ·

---

1. 8 U.S.C. § 1324(a) provides:

(a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

U.S.C. § 2(b)[2]. In three counts the indictment charged that defendant "did cause to be transported and moved by means of aircraft" three allegedly illegal aliens in violation of these statutes.[3]

On appeal defendant argues that the convictions cannot stand because merely causing aliens to be transported is not proscribed by the statutes. On this basis he challenges the sufficiency of the indictment and proof and the instructions to the jury. In addition he attacks the ruling by the trial court which denied an evidentiary hearing on his motion to disclose the existence of any records of electronic surveillance.

Viewing the evidence in the light most favorable to the government, as we must in this appeal from the convictions, *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir.), the government proof tended to show the following facts:

On January 10, 1977, two federal Border Patrol agents observed three persons whom they suspected were illegal aliens boarding a Cessna 172 airplane at the Silver City, N. M. airport. Before the agents could take any action, the plane departed. The agents determined the plane's destination to be Grand Junction, Colorado. They radioed their suspicion to the El Paso office, which notified the United States Immigration Service in Denver, Colorado. The Denver office contacted the Mesa County Sheriff's Office.

The Mesa County Sheriff and Sergeant Silva stopped the passengers after the airplane landed. In the ensuing conversation, the aliens admitted to Sergeant Silva that they had illegally entered the United States.[4] Through statements by the aliens, the federal agents learned that Alvillar had been paid to transport the aliens to the Silver City airport and to arrange for their chartered flight to Grand Junction.

The government proof also tended to show that on January 10, 1977, Alvillar had personally driven the aliens from an abandoned house at Columbus, N. M., to the

---

(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

(4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of—

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

2. 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

3. Since there was no proof of violation of § 1324(a)(2) by the pilot who was not shown to have had knowledge of the aliens' status, the charge of an aiding and abetting offense could not have been sustained. See *United States v. Rodgers*, 419 F.2d 1315 (10th Cir.). In closing argument defendant's counsel said that the failure to charge the pilot and owner of the charter service was significant. Government counsel responded that there was insufficient evidence to establish that the pilot and owner had the requisite knowledge. (II R. 203).

4. A conviction under § 1324(a)(2) requires that the government establish that the aliens had illegally entered the United States within the past three years. This was shown through testimony by the aliens that they entered the United States by going around the border checkpoint at Columbus, N. M., about two or three weeks before Alvillar arranged the charter flight. (II R. 112, 120, 128, 133–34).

airport at Silver City. This was approximately a 75 mile trip. At the airport, Alvillar had arranged with the owner of a charter service for a flight which would take the aliens to Grand Junction. The aliens paid Alvillar $600 cash for his services. Alvillar himself paid $300 to the owner of the charter service. Alvillar did not accompany the aliens on the flight.

Defendant Alvillar testified in his own behalf. He denied any knowledge that the three persons involved in the plane trip were illegal aliens. The defendant did not deny that he arranged the flight and drove the aliens by car to the aircraft.

## I

Both at the close of the government's case and after submission of all the evidence the defendant challenged the sufficiency of the indictment and the proof on the ground that the language "caused to be transported" does not constitute an offense under § 1324(a)(2). (II R. at 139, 187–89). For the same reason, Alvillar challenged the instructions of the trial judge, which incorporated language similar to that in the indictment. (Id. at 219–20). These motions and the objection to the instructions were overruled by the trial court.

■ Alvillar makes several arguments for limiting the scope of § 1324(a)(2) to persons who *actually* "transport" illegal aliens. First, he says that the interplay of § 1324(a)(1) and § 1324(a)(2) shows that Congress intended thus to limit § 1324(a)(2). The terms of § 1324(a)(1) make it unlawful for any person "by himself or through another" to transport aliens into the United States. Alvillar contends that the absence of such language as "through another" in § 1324(a)(2) limits its application to persons who actually transport aliens.

This difference in the sub-sections of § 1324(a)(2) does not have the significance attached to it by the defendant. Section 1324(a)(1) was originally enacted as ch. 29, § 8, 39 Stat. 880 (1917). Section 1324(a)(2) was added in 1952, being enacted in ch. 8, § 274, 66 Stat. 228 (1952). Thus § 1324(a)(2) was enacted subsequent to the codification of 18 U.S.C. § 2(b) in 1948 and its 1951 amendment.[5] The revisor's note to § 2 explains that:

> [s]ection 2(b) is added to permit the deletion from many sections throughout the revision of such phrases as "causes or procures."

Likewise, in view of the 1948 addition of § 2(b) to the Code, Congress did not need to include language such as that in § 1324(a)(1), "by himself or through another," when it added § 1324(a)(2) in 1952. It is true that there is the difference in the two parts of § 1324 as it was re-enacted in 1952, with only § 1324(a)(1) containing the "by himself or through another" language. We, nevertheless feel that this difference does not call for denying application to the clear, general provisions of 18 U.S.C. § 2(b) when dealing with a charge of an offense under § 1324(a)(2).

■ Second, Alvillar argues that § 1324(a)(2) does not apply for the reason that § 2(b) is a restatement of existing law and does not establish criminality where none exists, citing *Pereira v. United States*, 202 F.2d 830 (5th Cir. 1953), aff'd, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). While this circuit has recognized similar limitations on the scope of § 2(b), see *Breeze v. United States*, 398 F.2d 178, 183 (10th Cir. 1968), these limitations have no bearing on the case at bar. As we have previously explained, in *Breeze*, id. at 183:

> But that language [of 18 U.S.C. § 2] neither defines nor denounces as criminal

---

5. 18 U.S.C. § 2(b) is essentially a codification of the common law agency doctrine. The Supreme Court earlier recognized the doctrine's applicability to criminal cases in *United States v. Gooding*, 25 U.S. (12 Wheat.) 460, 469, 6 L.Ed. 693 (1827):

> . . . [H]e who commands, or procures a crime to be done, is guilty of the crime, and

the act is his act. This is so true, that even the agent may be innocent, when the procurer or principal may be convicted of guilt, as in the case of infants or idiots, employed to administer poison . . .

18 U.S.C. § 2(b) was first enacted in 1948, ch. 645, 62 Stat. 684, and amended in 1951, ch. 655, § 17b, 65 Stat. 717.

any act or omission which, without it, would have been lawful. It is rather a statutory canon defining an ingredient of criminal responsibility generally, than the definition by law of any crime. It simply provides for punishment as a "principal" of any one who, by his conduct brings himself within the reach of the many suppositions included in . . . either of the foregoing two paragraphs. Moreover, the appending in parentheses of the statutory citation . . . to an otherwise complete information or indictment, without more, itself charges no actionable crime.

Alvillar's contention that § 2(b) cannot be combined with § 1324(a)(2) is also contrary to the reasoning in *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). In *Pereira*, the Court affirmed convictions under the mail fraud statute, 18 U.S.C. § 1341, and the National Stolen Property Act, 18 U.S.C. § 2314. The Court stated (347 U.S. at 8, 74 S.Ct. at 362):

To constitute a violation of these provisions, it is not necessary to show that petitioners actually mailed or transported anything themselves; it is sufficient if they caused it to be done. 18 U.S.C. (Supp. V) § 2(b).

Third, Alvillar asserts that "there is a remarkably close analogy between the charge found jurisdictionally defective in *United States v. Gooding*, 25 U.S. (12) (Wheat.) 460 [6 L.Ed. 693] (1827), and the allegations in the indictment here." *Gooding* dealt with a prosecution under the 1818 Slave Act, which prohibited outfitting a ship "with intent to employ such ship or vessel" in the slave trade. Id. at 475. The Court reasoned that part of the indictment was defective, stating (id. at 477):

There is a clear distinction between causing a vessel to sail, or to be sent away, with intent to employ her in the slave-trade, and with intent that she should be employed in that trade. The former applies to an intent of the party causing the act, the latter to the employment of the vessel, whether by himself or a stranger. The evidence may fully support these counts, and yet may not constitute an offense within the act of congress; for the employment by a mere stranger would not justify the conviction of the party charged with causing her to sail or to be sent away, with intent to employ her in the slave-trade, as owner.

Thus, under the count in question the ship owner in *Gooding* was charged only with outfitting with intent that the vessel be employed in the slave trade. As noted, proof under such a charge of use in the trade by a mere stranger would not justify conviction of the offense of causing the vessel to sail with intent to employ her in the slave trade, as owner. Here, on the contrary, Alvillar directly arranged for the transportation of the aliens in the aircraft and earned a profit from it.

At oral argument Alvillar's counsel presented a further argument for limiting § 1324(a)(2) to persons who actually transport illegal aliens. Essentially the argument is that the legislative history of § 1324(a)(2) requires a construction which protects the normal employment practices of employers of migrant workers and requires an interpretation that the statute does not cover causing transportation of aliens.

The legislative history of § 1324 does indicate clearly that "employment shall not be deemed to constitute harboring." 1952 U.S.Code Cong. & Admin.News p. 1724. See, 8 U.S.C. § 1324(a). However, this case does not involve any charge of "harboring" or the employment of aliens and hence the argument is misplaced.

We bear in mind the canon that penal statutes are to be strictly construed. *United States v. Cook*, 384 U.S. 257, 262, 86 S.Ct. 1412, 16 L.Ed.2d 516 (1966). The canon does not, however, require us to give the statute its "narrowest meaning;" it is sufficient if the words are given their fair meaning in accord with the evident intent of Congress. Id. at 262–63, 86 S.Ct. 1412. We feel that the intent to punish generally persons who "causes an [unlawful] act to be done." is evident from the language of § 2(b). In view of this clear congressional

intent underlying § 2(b) we conclude that causing the transportation of the aliens here is an offense under 8 U.S.C. § 1324(a)(2).

## II

▉ Alvillar filed a pre-trial motion for disclosure of federal and state wiretap records pursuant to 18 U.S.C. § 2518 and a nearly identical state statute, N.M.S.A. 40A–12–1.6. As grounds for the motion, Alvillar claimed that a telephone call, which he had made on January 9, 1977, to the fixed base operator at the Silver City Airport for the purpose of chartering a Cessna 172 on January 10, 1977 had been subject to surveillance. The motion further alleged that "continuous investigation," apparently by Alvillar or his attorney, revealed that fixed operators at Silver City at that time had been under surveillance for possible narcotic violations. Finally, the motion asserts that the circumstances of the case "more than suggest that prohibited eavesdropping occurred" because the border patrol agents "just happened to come and observe" the three aliens board the plane.

The filing of the motion by the defendant triggers the government's duty to "affirm or deny" the existence of such evidence. 18 U.S.C. § 3504(a)(1).[6] At a pre-trial hearing on the motion, the court asked Assistant United States Attorney Collins whether he knew of any federal or state surveillance in the case. Collins responded that he had had an earlier conversation with Assistant United States Attorney Sandoval, who ultimately tried the case. Sandoval had informed Collins that he had contacted a federal official in Las Cruces, New Mexico, and state police. Neither office was aware of any surveillance. The court then ruled that there was no reason to proceed further on the motion. Defense counsel, who was present at the hearing, presented no evidence to substantiate the allegations in the motion and at that time did not object to the sufficiency of the denial by the government.

On the one hand, we must consider the specificity of the defendant's allegations of unlawful electronic surveillance and the evidence introduced in support of the allegations. Against these allegations, we measure the need for specificity in the government's denial and for comprehensiveness in the search of government records on which the denial is predicated. See *United States v. D'Andrea*, 495 F.2d 1170, 1174 (3rd Cir. 1974), cert. denied, 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88. Because Alvillar's allegations of surveillance are conclusory and unsupported, the denial by the Assistant United States Attorney was adequate. See *United States v. Brinklow*, 560 F.2d 1003, 1008 (10th Cir. 1977); *United States v. Villano*, 529 F.2d 1046, 1057 (10th Cir. 1975), cert. denied, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193.

Defendant's brief cites *Kolod v. United States*, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968), and *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1967), as authority for continuing the hearing on the motion even after the government's denial. (Appellant's brief, 10). However, the hearings required in *Kolod* and *Alderman* were necessary because the government admitted the existence of surveillance.

Since the government's denial was adequate and the defendant presented no evidence of an illegal surveillance beyond the unsupported allegations in the motion, the trial court properly ruled that it was unnecessary to conduct a further hearing on the motion. *D'Andrea*, supra, 495 F.2d at 1173–74.

AFFIRMED.

---

**6.** In pertinent part, 18 U.S.C. § 3504 provides:

(a) In any trial, hearing, or other proceeding in or before any court . . .

  (1) Upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act; . . .