OPINION
Defendant-Appellant Maurice Thornton was convicted of one count of possessing cocaine in an amount equal to or exceeding the bulk amount but in an amount less than three times that amount, in violation of former R.C. 2925.03(A)(4); and one count of knowingly preparing cocaine for delivery or distribution, in violation of former R.C. 2925.03(A)(2). Thornton was acquitted of one count of possessing criminal tools, R.C. 2923.24. Thornton now appeals from his convictions. We reverse for the reasons that follow.
The evidence presented below was that narcotics detectives with the Cleveland Metropolitan Housing Authority (CMHA) received information in 1995 regarding drug trafficking that reportedly originated from the CMHA apartment located at 4311 Quincy Avenue, Apt. 2366.
CMHA Detective Nagy testified that on December 7, 1995, he monitored a controlled purchase of cocaine between a confidential reliable informant and a suspect known then as "Mo." (Tr. 210- 213.) Nagy later identified Thornton as "Mo." Nagy observed the informant and Thornton engage in a brief conversation outside the apartment building located at 4311 Quincy and then walk into the apartment building located at 4315 Quincy Avenue. Approximately five (5) to six (6) minutes later, the informant exited that building, returned directly to Detective Nagy's undercover vehicle, and produced a tied plastic baggie containing rocks of suspected crack cocaine. (Tr. 214-215.)
Detective Nagy monitored a second controlled purchase of crack cocaine involving his informant on December 12, 1995. (Tr. 213- 216.) On this occasion, Nagy observed the informant enter the target apartment building at 4311 Quincy and Nagy then saw the informant on the second floor through a window. (Tr. 215-216.) The informant was with a male whom Nagy was unable to identify. Within a few minutes, the informant returned to Nagy's undercover vehicle and produced another tied plastic baggie containing a large chunk of suspected crack cocaine.
Thereafter, Nagy applied for and received a warrant to search the residence located at 4311 Quincy Avenue, Apt. 2366. In recounting the history of controlled purchases from the suspect premises, Nagy's affidavit in support of the warrant represented that on the date of the first controlled purchase, he "observed the [suspect] go up to the second floor of the [premises known as 4311 Quincy Avenue, Apt. 2366] and return to the spot where [the informant] was waiting * * *." The first sale of suspected crack cocaine reportedly occurred at that time and the informant exited the premises and returned to Nagy's undercover vehicle. With regard to the second controlled purchase, Nagy averred that after observing his informant enter the target building, the informant said that he went to the suspect apartment unit on the second floor where he "was met at the entrance door" by Thornton, and that the sale occurred in the hallway. Nagy's affidavit noted that test results for the suspected crack cocaine were not available at the time Nagy applied for the search warrant.
The evidence below was that these premises had been leased to Samantha Burgess. Thornton concedes that he had no property or possessory interest in her tenancy.
The search warrant was executed on December 15, 1995, by members of the SWAT Unit, accompanied by Detective Nagy and fellow CMHA Detective Kuska. Detectives Nagy and Kuska testified that after they entered the apartment building, Nagy proceeded to the stairwell between the second and third floors to secure that area while Kuska remained in the area of the first floor so that the SWAT Unit could gain entry.
Upon reaching his position, Nagy observed Thornton and another male, later identified as David Sharp, in the hallway outside Apt. 2366. Nagy testified that when the air horn of the SWAT Unit van sounded outside, two females came out of Apt. 2366 to see what the commotion was about. Sharp crowded around Thornton and told him that he better get inside the apartment immediately. (Tr. 231-232.) Nagy then identified himself as a police officer and ordered Thornton to stop, but when Sharp blocked Nagy from reaching Thornton, Thornton and the two females ran into the apartment. (Tr. 232-233.)
While Nagy detained Sharp, the SWAT Unit made a forced entry into Apt. 2366. SWAT member Swidersky testified that upon gaining entry, he shouted that it was the police with a search warrant. Observing two females in the living room, he proceeded directly to the bathroom. (Tr. 170-173.) Swidersky immediately saw Thornton run out of the bathroom and into the kitchen. (Tr. 175- 178.) Swidersky apprehended Thornton in the kitchen, at which time Swidersky observed a second male, later identified as Eric Burpo, also in the kitchen.
Once the premises and its occupants were secured, Detectives Kuska and Nagy entered the unit to execute the search warrant. Kuska proceeded directly to the bathroom where he heard the sound of a running toilet. (Tr. 324-327.) He looked into the toilet and observed a plastic bag with rocks of suspected crack cocaine floating on the water. As a result of his search of Thornton, Nagy confiscated a pager and $1, 895 in cash. (Tr. 251-252.) Shortly thereafter, Nagy also searched the bathroom and discovered a dark plastic bag that contained $4, 069 in cash. (Tr. 257.) Subsequent lab tests confirmed that the material retrieved from the toilet was 30 rocks of crack cocaine, a Schedule II drug.
Thornton was taken into custody and later indicted for offenses relating to the evidence obtained during the December 15, 1995 search.[1] The first count charged that Thornton knowingly possessed cocaine, a Schedule II drug, "in an amount equal to or exceeding the bulk amount but in an amount less than three times that amount," in violation of former R.C. 2925.03(A)(4). The second count charged that Thornton did knowingly "prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute" cocaine, a Schedule II drug, and that he knew or had "reasonable cause to believe that the drug was intended for sale or resale" by Thornton or another, in violation of former R.C.2925.03(A)(2). The third count charged Thornton with possessing criminal tools in violation of R.C. 2923.24, namely, money and a pager.
The matter proceeded to a jury trial. For his part, Thornton's witnesses testified that it was Burpo who had been in the bathroom, not Thornton.
The trial court dismissed that portion of the third count that charged Thornton with possessing a pager as a criminal tool. The jury convicted Thornton on the first and second counts, but acquitted him of possessing money as a criminal tool. Thornton was sentenced to a concurrent sentence of eighteen months actual incarceration on the first and second counts.
Thornton appeals and asserts as his first assignment of error the following:
I. THE COURT ERRED WHEN IT DENIED THE DEFENDANTS MOTION TO SUPPRESS, WHICH MOTION WAS RENEWED AT THE CLOSE OF ALL THE EVIDENCE.
Thorton's first assigned error relates to the December 15, 1995 search. This assignment of error is not well taken because Thornton did not establish that he had standing to challenge the legality of the search of Burgess's apartment.
"It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." United States v. Padilla (1993), 508 U.S. 77, 81
(emphasis in original).
Because Fourth Amendment rights are personal in nature, a defendant cannot assert vicariously that evidence taken from someone else's property violated the defendants rights absent a showing that the defendant personally had a reasonable expectation of privacy in the area searched. Rakas v. Illinois
(1978), 439 U.S. 128. See, also, Alderman v. United States
(1969), 394 U.S. 165. Standing is not conferred on "those who are aggrieved solely by the introduction of damaging evidence." Alderman, supra, 394 U.S. at 172. See, also, Rawlings v. Kentucky
(1980), 448 U.S. 98.
Consistent with these cases, the Supreme Court of Ohio held inState v. Williams (1995), 73 Ohio St.3d 153, cert. denied (1996),516 U.S. 1161, that the defendant lacked standing to suppress evidence allegedly obtained through an unlawful search of someone elses apartment. The court explained that the defendant had not shown he had a reasonable expectation of privacy in the apartment. Williams, supra, 73 Ohio St.3d at 166-167. In an earlier case, the court similarly ruled that the defendant had no personal privacy interest in his grandmother's apartment. State v.Coleman (1989), 45 Ohio St.3d 298, 306, cert. denied (1990),493 U.S. 1051.
In the instant case, Samantha Burgesss apartment at 4311 Quincy Avenue, Apt. 2366, was searched pursuant to a search warrant. Thornton did not demonstrate that he had a personal expectation of privacy in his friend's apartment. Moreover, Thornton conceded in a pre-trial suppression hearing that he lacked standing to suppress the evidence found during the search of Burgesss apartment. (Suppression Tr. 128.)[2]
Thornton has not identified any infirmity in Detective Kuska's discovery of the baggie of crack cocaine in the toilet. It was that discovery that provided the basis for Thornton's indictment. Under these circumstances, Thornton lacked standing to challenge the validity of the seizure of that evidence.
And if Thornton were in the apartment unit at the time that the unit was entered to execute the search warrant, we think the search warrant would authorize a search of Thornton's person as well, on the authority of State v. Kinney (1998), 83 Ohio St.3d 85.
While we conclude that Thornton lacked standing to challenge the lawfulness of the search of Burgess's apartment, we cannot help but be profoundly disturbed by material factual inconsistencies that cast serious doubt on whether there existed probable cause to search the Burgess apartment.
In particular, Detective Nagy's affidavit in support of the warrant represented that on the date of the first controlled purchase, he "observed the [suspect] go up to the second floor of the [premises known as 4311 Quincy Avenue, Apt. 2366] and return to the spot where [the informant] was waiting" at which time the sale was completed. In contrast, Nagy's testimony at trial was that his informant and Thornton went into the building at 4315 Quincy Avenue. Nagy acknowledged that he lost sight of the informant until he emerged from 4315 Quincy Avenue five to sixminutes later. (Tr. 210-215; 271.)
In light of Detective Nagy's trial testimony, it apparently was not true when he averred by affidavit that he had observed the suspect enter 4311 Quincy Avenue. We seriously doubt that the facts as testified to by Nagy at trial would be sufficient to establish probable cause to search the premises at 4311 Quincy Avenue, Apt. 2366.
We likewise doubt that the facts concerning the second controlled purchase would have been sufficient to establish probable cause to search the premises. With regard to that incident, Nagy's affidavit averred that his informant reported meeting the suspect at the entrance door to unit 2366 in the targeted building, that the suspect exited the apartment, and that the second controlled sale occurred in the hallway outside the premises.
But while we may have serious doubts as to whether the facts as presented by the officer at trial would have been sufficient to establish probable cause to search the particular premises, we are nevertheless constrained to hold that Thornton lacked legal standing to challenge the lawfulness of the search of those premises.
Accordingly, we overrule Thornton's first assignment of error.
Thornton's second, third, and fourth assignments of error all relate to the admissibility of evidence of the two (2) controlled drug purchases and will be addressed jointly. They assert the following:
II. THE PROSECUTOR WAS GUILTY OF GROSS MISCONDUCT IN THE WAKE OF THE VARIOUS INSTANCES OF HIS IMPROPER QUESTIONING OF DETECTIVE NAGY, WHICH QUESTIONS WERE INTENTIONALLY DESIGNED TO ELICIT, AS THEY DID, IRRELEVANT HEARSAY EVIDENCE AND WHICH WERE OTHERWISE CLEARLY CALCULATED TO VIOLATE APPELLANTS CONFRONTATIONAL RIGHTS.
III. THE COURT ERRED AND APPELLANT'S RIGHT OF CONFRONTATION WAS VIOLATED WHEN, DESPITE APPELLANT'S REPEATED OBJECTIONS, CONSIDERABLE IMPERMISSIBLE TESTIMONY THAT WAS CLEARLY HEARSAY WAS ADMITTED AS SUBSTANTIVE PROOF OF GUILT.
IV. THE COURT ERRED WHEN IT NOT ONLY ADMITTED, AS SUBSTANTIVE PROOF OF GUILT, CERTAIN EVIDENCE, WHICH TENDED TO SHOW THE APPELLANT COMMITTED CRIMES OTHER THAN THOSE CHARGED IN THE INDICTMENT AND (ASSUMING THIS EVIDENCE WAS ADMISSIBLE FOR SOME LIMITED PURPOSE) WHEN THE COURT FAILED TO APPROPRIATELY LIMIT SUCH ADMISSION IN ACCORDANCE WITH THE DICTATES OF RULE 404 (B), OHIO RULES OF EVIDENCE AND/OR R.C. OF OHIO 2945.59.
Thornton complains that evidence of the two controlled purchases by the informant in the week preceding the December 15, 1995 search was inadmissible and that its admission here was prejudicial error. We agree.
We start by considering whether the evidence of prior controlled purchases was relevant in this case. Under Evid.R. 401, "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence that is not relevant is not admissible. Evid.R. 402.
In this case, count one of the indictment charged Thornton with violating former R.C. 2925.03(A)(4) in that he did knowingly "possess a controlled substance in an amount equal to or exceeding the bulk amount, but in an amount less than three times that amount * * *." Count two of the indictment charged Thornton with violating former R.C. 2925.03(A)(2) in that he did knowingly "prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance, when the offender knows or has reasonable cause to believe the controlled substance is intended for sale or resale by the offender or another * * *." Count three charged Thornton with possessing criminal tools in violation of R.C. 2923.24, namely, money and a pager. The issue is whether evidence of the two earlier controlled drug purchases, for which Thornton was not charged, was relevant to these charges.
For its part, the state does not dispute that the evidence of controlled drug purchases constituted evidence of "other acts" under Evid.R. 404(B) and R.C. 2945.59. The state nevertheless maintains that evidence of the first two controlled purchases was admissible to show Thornton's modus operandi. We do not agree.
"Under longstanding principles of Anglo-American jurisprudence, an accused can not be convicted of one crime by proving he committed other crimes or is a bad person." State v. Jamison
(1990), 49 Ohio St.3d 182, 184. Consequently, "[e]vidence of other crimes, wrongs or bad acts independent of, and unrelated to, the offenses for which a defendant is on trial is generally inadmissible to show criminal propensity." State v. Wogenstahl
(1996), 75 Ohio St.3d 344, 366, cert. denied, 117 S.Ct. 240.
While "other acts" evidence may not be used to prove criminal propensity, such evidence may be admissible "if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove notice, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."State v. Lowe (1994), 69 Ohio St.3d 527,530. Because Evid.R. 404(B) and R.C. 2945.59 codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict.State v. Broom (1988), 40 Ohio St.3d 277, syllabus at paragraph 1.
In the instant case, however, the states evidence was qualitatively deficient in that it did not even prove that Thornton committed the other acts. The evidence pertaining to the first controlled purchase was that it occurred, if at all, after the informant and Thornton went inside the apartment building located at 4315 Quincy Avenue where they could not be seen by the investigating officers. There was no other competent evidence presented to show that Thornton made that sale. -.
With regard to the second controlled purchase, Detective Nagy testified that he observed his informant through a second floor window at 4311 Quincy Avenue, but Nagy was unable to identify the other male in the hallway. There was no other competent evidence presented to show that Thornton made that sale.
On this record, we do not think that the state met the threshold criterion of presenting "substantial proof" that Thornton committed the other offenses. Cf. State v. Lowe, supra.
Moreover, we fail to see how this evidence would be relevant for a proper purpose of showing Thornton's modus operandi. The issue here was whether Thornton committed the offenses on December 15, 1995. Thornton's supposed "modus operandi" was not relevant to the charges against him, and the facts relating to the controlled purchases were hardly so distinctive as to establish Thornton's identity in any event. Under these circumstances, we do not believe that this evidence was presented for a permissible purpose under Evid.R. 404(B) and R.C. 2945.59.
Alternatively, the state defends the admission of this evidence to lay the foundation that led to the search of the premises. But while such evidence might have some relevance in a suppression proceeding, the same cannot be said for the trial. In this case, we fail to see how the events leading up to the issuance of the search warrant were relevant to prove whether Thornton was guilty of the charges that arose exclusively from the execution of the search warrant.
We are aware that statements which are not offered to prove the truth of the matter asserted and are instead offered to explain a police officers conduct during a criminal investigation are not hearsay. See, e.g., State v. Thomas (1980), 61 Ohio St.2d 223,232. In appropriate circumstances, statements by informants to an investigating officer may be admissible to explain the officer's conduct. See, e.g., State v. Williams (1996), 115 Ohio App.3d 24,44. In this case, however, we fail to see how an explanation of the officers investigation was relevant to the issue of whether Thornton was in possession of contraband on December 15, 1995.
Had the state articulated a proper use of this evidence, the danger of misuse of the evidence could have been reduced if not eliminated by an appropriate limiting instruction. Cf. Evid.R. 105. We note that Thornton requested such an instruction, but the court concluded at that time that Thornton had not been substantially prejudiced by this evidence and declined to give a limiting instruction. (Tr. 245-250.)
To the extent that this evidence could have had some relevance to the issues in this case, Evid.R. 403(A) directs that such evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
In this case, the admission of this evidence permitted the jury to treat unproven allegations that Thornton participated in two prior controlled purchases as substantive evidence that Thornton was guilty of possessing cocaine for distribution on December 15, 1995. Unless the state was prepared to prove Thornton's guilt as to the two controlled purchases, this evidence merely served to distract the jury from deciding whether Thornton was guilty of the offenses for which he was charged.
We note that the trial court has discretion to weigh the evidence under Evid.R. 403. See State v. Harcourt (1988), 46 Ohio App.3d 52. However, we conclude that the prejudice to Thornton outweighs the dubious relevance of this evidence. The failure of the court to provide a timely limiting instruction, as defense counsel properly requested, compounded the error.[3] See State v. Matthews (1984),14 Ohio App.3d 440.
Under the circumstances of this case, we therefore conclude that it was error to allow the state to introduce evidence of the pre-search controlled purchases.
We also cannot agree with the states suggestion that the admission of this evidence was harmless error. The introduction of inadmissible other acts evidence is not harmless unless there is no reasonable probability that the evidence substantially affected the outcome of the trial. See State v. Lytle (1976),48 Ohio St.2d 391, para. 3 of the syllabus, vacated in part on other grounds (1978), 438 U.S. 910; State v. Cotton (1996), 113 Ohio App.3d 125;State v. Goines (1996), 111 Ohio App.3d 840.
Here, after examining the totality of the evidence adduced at trial, we cannot say that the impermissible evidence of unproven drug sales did not reasonably contribute to Thornton's convictions. We believe it is more probable that this evidence did contribute to the jury's verdict. Consequently, we conclude that permitting evidence of the two pre-search controlled purchases constituted prejudicial error.
The second, third, and fourth assignments of error are sustained.
Thornton's fifth assignment of error states:
V. THE COURT ERRED WHEN IT DENIED THE MOTION FOR A MISTRIAL.
Thornton's fifth assigned error contends that he should have been granted a mistrial because of the evidentiary issues he raises in his preceding assignments of error and because of questions by the prosecutor indicating that the search warrant had been approved by a judge.
"Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." State v.Franklin (1991), 62 Ohio St.3d 118, 127, cert. denied (1992),504 U.S. 960. "The grant or denial of an order of mistrial lies within the sound discretion of the trial court." State v. Garner
(1995), 74 Ohio St.3d 49, 59, cert. denied (1996), 517 U.S. 1147.
While our review of the entire record convinces us that it was prejudicial error to allow evidence of the prior controlled purchases without so much as a limiting instruction, we are not prepared to say that a fair trial was no longer possible at the time that the court denied Thornton's motion for a mistrial. (Tr. 245-250.) We are mindful that imperfectly tried cases may still proceed to a final disposition and that in spite of the best efforts of the trial judge to correct errors when they occur, the prejudicial effect of some evidentiary errors may not be fully appreciated in the rapidly unfolding events of a trial.
In this case, Thornton's motion for a mistrial was made during the testimony of Detective Nagy, the state's second witness. It is not inconceivable to us that a tenable basis for this evidence might still have been articulated or that the prejudicial effect of the evidence could have been reduced by an appropriate curative instruction from the court. Thornton did not renew his motion for a mistrial at the conclusion of the states case. On this record, we are not prepared to say that the court abused its discretion at the time that it denied Thornton's motion for a mistrial.
We likewise cannot say that the prosecutors references to a judges approval of the search warrant represented prejudicial error. Thornton did not object to all of the comments about which he now complains. (Tr. 308-309.) When Thornton did object, the court sustained his objections. (Tr. 217-218. 309-310.)
Under these circumstances, we do not think that the court abused its discretion when it denied Thornton's motion for a mistrial. The fifth assignment of error is overruled.
Thornton's next assigned error states:
VI. THE COURT ERRED NOT ONLY WHEN IT FAILED TO ADDRESS THE FORFEITURE ISSUES IN THIS CASE, IT ALSO ERRED WHEN IT FAILED TO ORDER, AS HAVING BEEN ILLEGALLY SEIZED, THE RETURN OF MONIES SEIZED FROM APPELLANTS PERSON AND FROM THE PREMISES.
The third count of the indictment charged that Thornton's possession of cash on the date of his arrest constituted possession of a criminal tool. The cash found on Thornton's person was seized as evidence and was held subject to forfeiture in a designated law enforcement trust account during the pendency of Thornton's criminal proceedings. Following Thornton's acquittal on the count charging him with possessing criminal tools, the trial court granted Thornton's post-trial motion for return of the seized monies and ordered the state to return the sum of $1, 895 representing the cash seized from him.
At oral argument, Thornton's counsel acknowledged that the lower courts disposition resolved Thornton's sixth assignment of error, so it is moot.
VII. THE COURT ERRED WHEN IT DENIED THE DEFENDANTS MOTION FOR JUDGMENT OF ACQUITTAL.
Thornton's last assignment of error contends that there was insufficient evidence to support his convictions. We cannot agree.
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendants guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, followed.)
State v. Jenks (1991), 61 Ohio St.3d 259, syllabus at paragraph 2.
The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass
(1967), 10 Ohio St.2d 230, syllabus at paragraph 1.
In this case, we think that there was sufficient evidence presented which, if believed, could convince an average juror of Thornton's guilt. After the SWAT Units air horn sounded and Detective Nagy identified himself as a police officer to Thornton and Sharp and ordered Thornton to stop, Nagy saw Thornton run into the apartment. SWAT Unit member Swidersky saw Thornton run out of the bathroom just as the SWAT Unit made its forced entry. Immediately after the SWAT Unit secured the premises, Detective Kuska went directly to the bathroom where he heard a running toilet and retrieved the plastic baggie and its contents from the toilet. The contents of the baggie later tested positive for cocaine.
Viewing this circumstantial evidence in the light most favorable to the prosecution, a rational trier of fact could find that Thornton was in possession of a controlled substance and therefore guilty of former R.C. 2925.03(A)(4), as charged in the indictment.
We likewise think that a rational trier of fact could find that Thornton did knowingly prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance, and he did so knowing or having reasonable cause to believe that the drug was intended for sale or resale by himself or another, in violation of former R.C. 2925.03(A)(2). In addition to the circumstantial evidence that Thornton possessed the contraband, the states evidence was that the crack cocaine seized amounted to 30 rocks. The police testified that possession of such an amount was "unusual." (Tr. 335.) We conclude that this evidence could establish the elements of the offense.
We overrule Thornton's seventh assignment of error.
The judgment is reversed. The cause is remanded for further proceedings.
This cause is reversed and remanded.
It is, therefore, ordered that appellant recover of appellee his costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, J. CONCURS,
 MICHAEL J. COPRIGAN, J. CONCURS IN JUDGMENT
 ONLY (See attached Concurring Opinion).
DIANE KARPINSKI, PRESIDING JUDGE.
[1]Thornton was not charged in connection with either of the earlier controlled drug purchases.
[2] Thornton's pre-trial suppression motion sought in part the return of the money that was seized from him. Thornton was in fact acquitted of the charge relating to possession of money as an alleged criminal tool, and the court later ordered that that money be returned to him.
[3] In the course of its subsequent charge to the jury, the court did observe: "You are not trying the sale of cocaine. You are trying the three charges I just gave you." (Tr. 502.) This passing observation was too vague because it did not identify a permissible purpose or limit the use of this questionable evidence expressly to a permissible purpose. Thus the jury remained free to consider the evidence for an improper purpose. If the court intended this observation to be a limiting instruction, we think that instruction was too little and too late.
 CONCURRING OPINION